RAY E. PROBERT ET AL., APPELLANTS, v. SYDNEY GRINT ET AL., APPELLEES.

28 N. W. 2d 548

Filed July 18, 1947.   No. 32186.

*George I. Craven,* for appellants.

*Schaper & Schaper,* for appellees.

Heard before SIMMONS, C. J., PAINE, CARTER, MESS-MORE, YEAGER, CHAPPELL, and WENKE, JJ.

MESSMORE, J.

The plaintiffs, as owners of the southwest quarter of Section 9, Township 19 North, Range 17 West of the Sixth Principal Meridian in Custer County, Nebraska, instituted this action in equity in the district court against the present owners of the northeast and southeast quarters of Section 9, and against Comstock Township which maintains an east and west township road between the north and south halves of Section 9. The purpose of the action was to enjoin the defendants from maintaining a dam and ditch in the township road, from maintaining a dam and ditch on the northeast quarter of Section 9, to require defendants to remove the dams and ditches constructed by them; and for such other and further relief as equity affords.

For convenience we will not hereafter detail the description of the lands involved in this appeal, but will make reference thereto as to the location in Section 9.

The plaintiffs' petition is in accordance with the purpose of the action as hereinbefore described. The defendants' answers deny the construction of dams and ditches affecting natural drainways that in any manner divert surface waters over to and upon the plaintiffs' land.

The district court found generally in favor of the defendants and against the plaintiffs, and entered a judgment denying the injunctive relief to the plaintiffs as prayed for in their petition. Upon the overruling of their motion for new trial, the plaintiffs appeal.

For convenience the parties will be referred to in their original status as the action was tried in the district court.

The plaintiffs' assignment of error is that the judgment of the district court is contrary to the evidence

and the law. This requires a review of the evidence, as the case is tried de novo in this court. We therefore give the following resume of the relevant and material evidence adduced from the record.

The record shows that George M. Probert, the father of plaintiff Ray E. Probert, held fee simple title to the southwest quarter of Section 9 from November 16, 1891, to April 1, 1935, or for a period of approximately 44 years, when he conveyed this land to the plaintiffs. The title of the other quarters in Section 9 appear in the record and disclose that George M. Probert and his wife also at one time owned the northeast quarter and the southeast quarter of Section 9. It appears that some of the Proberts lived on the northeast and southeast quarters from about 1908 to 1937. The defendants Sydney and Josephine Grint acquired title to the northeast quarter by deed September 5, 1942, and went into possession March 1, 1943. Harold E. Grint became the owner of the southeast quarter, by deed, May 10, 1940.

The defendant Sydney Grint was born on June 10, 1895, on a farm located in the first section west of Section 9, where he lived until 1923, at which time he moved to his present residence on the northwest quarter of Section 9. Harold Grint was born in October 1891, on the section west of Section 9; lived there until September 1917; farmed the northwest quarter of Section 9 in 1920; and lived on the northeast quarter of Section 9 from 1920 until 1944, when he moved to the southeast quarter of Section 9.

The plaintiff Ray E. Probert was born in Iowa; moved to Nebraska in 1889, and first moved to the northwest quarter of Section 9 where he lived one year; then moved to the southwest quarter of Section 9 where he has lived for more than 55 years.

The following sketch will permit a better visualization of the conditions existing at the scene of the controversy.

Section 9, Township 19, Range 17 West, 6th P.M., Custer County, Nebraska

Contours and elevations are eliminated from the above sketch. There appears in the evidence, however, defendants' exhibit 23, containing elevations and

contours, which is a map of the drainage area in controversy; also, exhibit 11, a plat made by the plaintiffs' engineer witness; and field notes, profiles, and levels made by engineers for both plaintiffs and defendants.

The east and west road between the north and south halves of Section 9 has been traveled since 1908. On May 6, 1924, a petition for a 33-foot road was filed by G. M. Probert, his wife Margaretta Probert, and others. The petition was granted July 31, 1926. Later, G. M. Probert, Margaretta Probert, and R. E. Probert, one of the plaintiffs, signed a petition agreeing to give an additional seven feet on the south side of this road, in order to make a 40-foot road. This petition was granted June 30, 1930. The road extends from the west boundary line of Section 9 east for a distance of 195 rods. The road was taken off of the north side of the south half of Section 9, with the north side of the road being the south boundary of the north half of the section. It extends east from the southwest corner of the northeast quarter, and the northeast corner of the southwest quarter about 35 rods in the direction of Harold Grint's house, and then southeast thereto.

There are 19.1 acres that contribute water to the mouth of the west canyon, and 33.3 acres of the drainage area that contribute water to the mouth of the east canyon. There are 15.5 acres representing the area that contributes water that will lead to the township road. The total of 67.9 acres represents the drainage area on the northeast and northwest quarters as disclosed by defendants' exhibit 23, or, in other words, that contributes water to the draws in the northeast quarter of Section 9 leading to the center of the section.

Before the road was considered as a township road, George M. Probert placed a 10-inch culvert about 100 feet west of the northeast corner of the southwest quarter of Section 9. In August 1932, a larger culvert, which is 30 inches in diameter and of corrugated pipe, was placed in the highway under the supervision of

George M. Probert at the same point, and is still there. The reason for replacing the 10-inch culvert with the 30-inch culvert was because the smaller one filled up, and would not carry the volume of water that flowed through it from the west drain. No culverts were placed east of this pipe until 1944.

The surface waters from the east and west canyons drain onto a rolling piece of ground approximately 500 feet square in the southwest corner of the northeast quarter, which has always been under cultivation. This point is designated as being important for the reason that it receives the surface waters as heretofore indicated.

The plaintiff Ray E. Probert testified in substance as to his acquaintance with the northeast quarter, the 500-foot square piece of ground above described, and with the flow of the surface waters from the east and west canyons; that 52 years ago the west watercourse ran across the southeast corner of the northwest quarter onto the southwest quarter. About 25 years ago the west watercourse changed by nature and went on south and across the township road onto the southeast quarter, the change occurring in 1920. The other watercourse on the southwest corner of the northeast quarter came from the northeast on the northeast quarter from the mouth of the east canyon, where it proceeded on to level ground, and in 1925, it cut a smaller course right down along the road. The course of this drain was practically straight south from the place it started to where it crossed the township road at the gateway. The largest one of the three drainage courses came out of the canyon and ran south and west. It was probably two-thirds of the distance from the east drainway over to the west drainway, and it went over onto the southeast quarter of Section 9. The east watercourse was not in existence 52 years ago. The center watercourse and the west watercourse were in existence at that time, the center watercourse being the larger, and drained the largest basin. The east water-

course came into existence about 1925. This watercourse developed to the size it is at this time in approximately three years.

The watercourses having been designated as the east, center, and west drains, the plaintiff further testified, in substance, as to the manner in which these watercourses crossed the south boundary line of the northeast quarter in 1942: When the water left the east canyon into the east watercourse, it flowed generally south and crossed the south boundary of the northeast quarter at the gateway, which is approximately 500 feet from the west line of the northeast quarter. The center watercourse ran south into the northeast quarter, then west and crossed the south boundary line of the northeast quarter approximately two-thirds of the distance from the east watercourse to the west watercourse, approximately 150 feet from the southwest corner of the northeast quarter. The west watercourse started approximately a quarter of a mile north of the south boundary line of the northeast quarter and ran southeast for approximately half of that distance, then flowed to the southwest until it was close to the line fence between the northeast and northwest quarters, and then ran practically straight south over onto the southeast quarter at approximately 17 or 18 feet from the west line of the northeast quarter.

The drainway on the east proceeded south across the road and meandered in a southerly direction almost straight south into an old irrigation ditch until that ditch was filled up, then ran down to the west line of the southeast quarter. The center watercourse has always run southwest after it crossed the road, close to the west line of the southeast quarter, and then south. The west watercourse, since it changed by nature in 1925, went south along the west side of the southeast quarter approximately a rod and a half from the boundary line fence between the southeast and southwest quarters until it got almost a quarter of a mile south,

and then turned slightly to the east, and in a southerly direction and ran off of that quarter.

The middle watercourse and west watercourse converge 50 feet south of the township road, and from the point where they converge there was a well-defined watercourse. In 1942, this watercourse was at least eight feet deep, a quarter of a mile long before it started to turn to the east, and at the north end, approximately 50 feet wide.

This witness described other features and flow of the drainways as hereinbefore indicated. However, the foregoing testimony is sufficient to show his contention with reference to the flow of surface waters from the northeast and northwest quarters of Section 9.

Other witnesses testifying for the plaintiffs substantially corroborated the plaintiffs' version of the drainways heretofore set forth.

The defendant Sydney Grint testified in substance, that his acquaintance with the drain of the surface water on the northeast quarter was for a period of 20 to 25 years. He detailed the number of times that he had been on the northeast quarter and the circumstances under which he became acquainted with the drainage thereon, which we deem unnecessary to set out. There was no east nor center drain in existence for that period of time, and such drains did not come into being until the latter part of May 1942, after an unusually hard rain which occurred on the 12th of that month, consisting of four or five inches within a space of 30 or 40 minutes, and another hard rain occurring about May 27, 1945, which washed the center and east drains wider and deeper.

The testimony of the defendants and their witnesses with reference to the drainage of the surface waters from the east and west canyons is, in substance, as follows: The waters from the east and west canyons join together on the northeast quarter at a point approximately 225 feet east of the west line of that

quarter and approximately 500 feet north of the south boundary line of the northeast quarter. From this junction point the surface waters from the east and west canyons flow southwest, then south into a drain which has been designated as the west drain, then across the south boundary line of the northeast quarter approximately 17 feet east of the center of the section designated as the quarter-section corner, and empty into the north ditch of the township road. From this point the surface waters from the west drain flow west in the north ditch of the township road for a distance of approximately 117 feet to a pipe culvert in the township road which is situated about 100 feet west of the quarter-section corner, and flow through the culvert in a well-defined drain onto the southwest quarter. From time immemorial, until about 1920, this west drain carried water across the southwest corner of the northeast quarter at a distance of approximately 125 feet north of the quarter-section corner where the water flowed diagonally in a southwesterly direction across the corner, came out on the south line of the northwest quarter approximately 100 feet west of the quarter-section corner and crossed the township road at the same place where the pipe culvert is now located, then continued on southwest onto the southwest quarter.

The defendants' engineer estimated that the drain extending from the east canyon west over to the drain from the west canyon would handle rains falling at the rate of one inch per hour, before overflowing, and a rainfall exceeding this rate would have to fall before the surface water from the east canyon would overflow from that drain to the center and east drains. He gave as his opinion, based on his survey and experience as an engineer, that the drain extending west from the east canyon over to the west drain, is the original and main drain because it takes the water first, and there was no evidence of the existence of the cen-

ter and east drains to indicate such drains had been in existence for a very long time.

Further testimony of the defendants' witnesses was to the effect that the surface water from the east canyon does not flow in what has been designated as the center and east drains except during or after an unusually hard rainfall, when sometimes waters which overflow from the connecting drain between the east canyon and the drain from the west canyon will run down the center and east drains. The overflow waters in the center and the east drains reach the township road at the point as testified to by the defendants' witnesses; the overflow water from the east drain being approximately 500 feet east of the quarter-section corner. On reaching the north ditch of the township road, it flows west to the wooden culvert, and the overflow water from the east drain reaches the township road approximately 150 feet east of the quarter-section corner and flows into the wooden culvert onto the southeast quarter. The overflow surface waters flowing onto the southeast quarter from the center and east drains work southwest in a diffused state to the fence line between the southeast and southwest quarters, and flow along the line to a place about midway therein where the surface waters spread out, some flowing southeast, some south, and some along with the other waters flowing in a southwesterly direction in a diffused state on the southeast quarter where such waters converge and flow southwest onto the southwest quarter. The water continuing south usually works across the southwest quarter about 300 feet north of the south line, and at another place about 350 feet north of the south line.

The flow of surface waters from the canyons and the drains as aforesaid, after they flow onto the southwest quarter, as contended for by the defendants, is controverted by the testimony of the plaintiffs' witnesses. The reason is that the plaintiffs contend that there is a natural ridge from the quarter-section corner between

the northwest and northeast quarters a distance of 600 feet north, and also between the southwest and southeast quarters, that constitutes a barrier so that any surface waters coming from the canyons cannot run over the ridge onto the southwest quarter. The elevations of the ridge are given according to the plaintiffs' conception of the same. There is a hog wire fence between the quarters of land heretofore described. The defendants' testimony is to the effect that the ridge is the result of wind erosion, and by the hog wire fence becoming covered with dirt and debris, which causes the water from the west drain to flow in the manner as hereinbefore described, 17 feet east of the quarter-section corner, thence west in the north ditch of the township road 117 feet, through the pipe culvert and onto the southwest quarter. The result of the dirt and debris that has washed and blown into the hog wire fence deflected the water in the west drain from the manner in which it originally flowed to the place where it has flowed since approximately 1920.

It is the plaintiffs' contention that Sydney Grint, in April or May of 1943, dug a ditch on his farm at a point near the beginning of the center drainway and near the outlet of the east canyon, west, connecting the center drainway and the west drainway, and made a dam below this ditch by piling the dirt which he took out of the ditch across the center drainway and the east drainway. The dam and ditch so constructed by Sydney Grint diverted the water that naturally flowed from the east canyon through the center and east drainways to the west drainway. This work resulted in a dam about 50 feet long and more than two feet across the east and center drainways where they came out of the canyon and turned south, and a ditch had been cut above the dam from the center drainway and the west drainway through the high ground. One witness for the plaintiff testified that the ditch was an excavation because it went through a natural ridge; and the

dam was man-made because the fill-in was above the natural course of the lay of the land. An engineer, who made no measurements or survey of the northeast quarter, testified from observation that the dam and ditch were man-made. This testimony was controverted by the defendant Sydney Grint, who admitted that in April or May of 1943, he and his boys did some work in the drain which runs west from the mouth of the east canyon over to the drainway from the west canyon at the point where that drain joins with the west drain; that there is a small field about 125 feet by 250 feet to the north across that drain; he desired to farm this tract along with that part south of the drain. He denied that he constructed a dam, as contended for by the plaintiffs; testified the drain connecting the east and west canyons was about six or eight feet wide and about four feet deep, and the banks were sharp and could not be crossed with horses and farm machinery, so he plowed the banks to make them more sloping, to enable him to cross the little field across the drain.

The defendants' engineer testified that he could not positively determine whether or not a dam had been built across the center and east drains, or whether the bank was the result of an act of nature. He did not see any indication that work had been done there by anyone to make a dam; what he saw looked like the regular bank of the draw. He did see evidence of debris in the bank, which had been washed there.

The plaintiffs contend that Harold Grint, with the assistance of one of Sydney Grint's boys, on May 10, 1944, did some work on the township road by constructing a ditch starting 17 feet east of the quarter-section corner and running through the ridge which divides the northwest and southwest quarters and the northeast and southeast quarters of Section 9. This was accomplished by taking the dirt out of the ditch on the north side of the township road and dumping it into the channel of the west drainway where the channel

crossed the roadway and piling the dirt several inches higher than the rest of the roadway so as to make the grade of the roadway across the west drainway higher than the roadway east and west, and by so doing, changed the course of the west drainway from running south onto the southeast quarter, and forcing the water in the west drainway to run through the ridge 117 feet west then south through the pipe culvert onto the southwest quarter.

The defendants' testimony is that in the latter part of May, or the first part of June 1943, the plaintiff Ray E. Probert, with the assistance of his son, constructed a dam across the township road at the quarter-section corner, which commenced in the southeast corner of the northwest quarter and extended across the north ditch of the road, across the road, and across the south ditch of the road to the northeast corner of the southwest quarter; the part of the dam in the north ditch being about three feet high and four or five feet wide, and the portion extending across the road about 15 to 18 inches high and about two feet wide. The portion extending across the south ditch was about four feet wide and high enough to make the top of the dam level clear across the road and both ditches. This dam remained in place until May of 1944, and during that period of time water from the west drain which was forced to flow across the township road because of this dam, made a wash-out in the road, and after a hard rain in May 1944, the wash-out across the road was approximately six to eight feet wide and about three feet deep.

The plaintiff denied that he ever put any dirt in the roadway, or a dam across the road, and said that what he did was to put two or three scrapers full of dirt on the south side of the roadway south of the traveled portion thereof, near his northeast corner, to stop the water from coming over onto his land. However, due to the increased volume of water flowing through the west drain, caused by the ditch and dam constructed by

Sydney Grint, and the ditch constructed by Harold Grint, the plaintiffs' efforts in such respect to stop the flow of the water onto the southwest quarter were unsuccessful.

The effect of the dam constructed by the plaintiff Ray E. Probert, as contended for by the defendants, was to force the water coming out of the west drain to run across the township road onto the southeast quarter, and prevent it from running west in the north ditch of the township road to the culvert 100 feet west of the quarter-section corner, onto the southwest quarter.

The defendant Harold Grint's testimony is that on or about May 10, 1944, he removed the part of the dam in the north ditch and the part which extended across the grade, and filled in the wash-out in the road which was caused by the dam. The dirt of the dam across the grade was placed in the wash-out in the road, as was the dirt of the dam in the north ditch. He cleaned out a portion of the north ditch, and denied that he had constructed a ditch from the quarter-section corner west of the steel culvert, or in any manner did anything to raise the grade of the road.

The township clerk testified that in May of 1944, he inspected the township road at a point near the quarter-section corner and observed that there was a dam which extended across the road and deflected the water coming out of the west drain onto the southeast quarter which caused a wash-out in the road, making the road almost impassable by car. The township officers authorized Harold Grint to remove the dam and fill in the wash-out in the road; to take the dirt from the dam and place it in the wash-out if necessary; to clean out the dirt which had washed into the north ditch; and use the dirt to fill the wash-out in the road.

The defendant Sydney Grint further testified that in May of 1944, the plaintiff Ray E. Probert constructed another dam all the way across the road at the same place. In the ditch on the north side of the road this

dam was five feet high, and across the roadway high enough so that the new model cars could not pass over it. In the south ditch the· dam was four or five feet wide at the bottom, and two or three feet wide at the top. The dam was built directly across the road from the quarter-section corner to the south fence of the road. The plaintiff denies that he built a dam in any such manner; that the dam did not extend across the roadway, but only across the north ditch to keep the water from running west through the ditch and going onto his land.

The testimony is in conflict also as to the work done on the township road. The plaintiffs' testimony is to the effect that the township road east from the quarter-section corner was first graded by the township in the fall of 1944; it was worked before that, but not graded. The testimony of Harold Grint with reference to the township road is that it was worked in 1926; that from the quarter-section corner west for a distance of about 60 rods, which would be past the steel culvert 100 feet west of the quarter-section corner, dirt was taken from the fence line between the north side of the road and the south boundary of the northwest quarter and piled in the road; the ditch on the north side of the road was cleaned out and the dirt from it piled on the road, which raised the grade of the road; that the road again was worked about 1930, when a caterpillar tractor and road grader were used and ditches were made on both the north and south sides of the road; the dirt taken from the ditches was put in the road in order to create a grade. The road overseer of the township from 1919 to 1940, testified he worked the road in the fall of 1939, when he graded east from the steel culvert 100 feet west of the quarter-section corner to the road running north through the northeast quarter of Section 9. In addition to grading the road, a dip therein was repaired, which was about half way between the quarter sections and the section line, and a wooden culvert was put in the road

about half way from the quarter-section corner east to the end of the road, at the suggestion of the county engineer that such a culvert be placed any place that was low, the work being done under the supervision of the township road overseer. The wooden culvert was obviously placed in such position to receive the surface waters from the northeast quarter, as heretofore explained, and under the defendants' version of the flow of such water, would receive the overflow waters which flow down the center drain and run into the north road ditch which then run through the wooden culvert onto the southeast quarter rather than west in the north ditch to the steel culvert. The overflow waters running down the east drain would flow into the north ditch on the road and then west in the ditch to the wooden culvert.

The testimony is that the township road was properly constructed, as such roads are constructed in Custer County.

The conversations alleged to have been had by the plaintiff Ray E. Probert and Sydney and Harold Grint, and their denial of such conversations, we deem unnecessary to review.

The plaintiffs make certain contentions with reference to the survey of the defendants' engineer and the elevations taken by him at the point where the west drain enters into the north ditch of the township road. The opinion of the plaintiffs' engineer is that the waters from the west drainway flowed across the road approximately 17 feet east of the quarter-section corner for a long time in the past, and before the grade was put in the road; also, that the road grade is extra high at this particular point where the waters from the west drainway flow into the road right-of-way, and the grade serves as a dam. Several readings of elevations appear in the evidence to disclose that seven feet south of the quarter-section corner the land is two-tenths of a foot lower than the bottom of the west drainway as it

comes onto the township road from the northeast quarter, indicating the waters would have a fall of two-tenths of a foot over a distance of about 27 feet. Such fall would, by necessity, cause the water to run west to the pipe culvert in the ditch dug by the Grints and the township for that purpose, since it was stopped from running south by the grade in the roadway. Also, the bottom of the ditch on the south side of the township road is nine-tenths of a foot lower than the bottom of the ditch on the north side of the road. It is therefore apparent that the defendants, by making the grade in the road at the place where the west drainway crossed the township road, constructed a dam three feet high directly in the channel of the west drain. It is a physical fact that the ground immediately south is lower than the ground north at the point as heretofore designated. However, from time immemorial, as testified to by a number of witnesses, the natural drainage course of the west drain has been across the southwest corner of the northeast quarter, across the southeast corner of the northwest quarter to a place about 100 feet west of the quarter-section corner, then, as now, at the position of the pipe culvert as heretofore set out.

Defendants' exhibit 23 also shows that the general course of the drainage of water from the southwest corner of the northeast quarter is southwest and across the northeast corner of the southwest quarter. The land at the quarter-section corner slopes to the west and southwest, as shown by the elevations on exhibit 23.

The depression in the northwest corner of the southeast quarter is the result of a wash-out, and not of the normal flow of water from the west drain; and the depression to the east of the fence between the southeast and southwest quarters is due to wash-out, because the hog wire fence between the two quarters became drifted full of dirt as the result of wind erosion.

The plaintiffs contend that during recent years the defendants Grint have changed their mode of planting

crops so that ridges are formed on their lands in such a manner as to divert the surface waters coming onto such lands over to and upon the plaintiffs' land. The testimony is to the effect that changing the mode of planting, and diversifying such planting to cause ridges on such lands to be different succeeding years, is not unusual or out of the ordinary.

While request was made by the plaintiff Ray E. Probert to the township authorities that the pipe culvert should be moved to a position 17 feet east of the quarter-section corner to receive the flow of the surface waters in the west drain which plaintiffs contend naturally flow across the township road onto the southeast quarter, it is apparent that this request was not made until recently, and that through a number of years the plaintiffs were apparently content to leave the pipe culvert in the position that it is now in.

We are not in accord with the plaintiffs' contention that the evidence is insufficient to support the judgment of the trial court.

From the foregoing evidence, and after a view of the premises and the physical facts with reference to the surface waters involved in this litigation, it is apparent that the trial court, by finding generally in favor of the defendants and against the plaintiffs, determined the following important points involved:  The original and natural drain of the surface water originating in the east canyon flows in a westerly direction over to the west drain.  The surface water flowing from the west drain onto the northeast quarter has, from time immemorial, flowed onto the southwest quarter rather than onto the southeast quarter.  That is, originally the drainage water in the west drainway flowed across the southwest corner of the northeast quarter and the southeast corner of the northwest quarter 100 feet west of the quarter-section corner, where the pipe culvert is now situated.  Further, the effect of the district court's finding is that what the plaintiffs contend constitutes

a natural ridge between the northwest and northeast quarters, and the southwest and southeast quarters, is the result of deposits of dirt and debris in the hog wire fence accumulated by the collection of substances and by being windblown, that would have a tendency to deflect water. Further, that the township road is properly constructed; meaning it had a proper grade and ditches on the north and south sides. Further, that the work alleged to have been done by Sydney Grint on the northeast quarter, and the work done by Harold Grint on the township road, were not of a nature that such work was sufficient and neither was the work of the township on the township road sufficient with respect to the grade and ditches thereon, to cause the surface waters from the east and west canyons on the northeast quarter to be diverted onto the plaintiffs' land.

As aforesaid, the trial court also went upon and viewed the premises and the physical facts with reference to the drainage of the surface waters involved in this litigation. In this connection, the following authorities are applicable to a determination of this appeal which presents purely a factual situation: "When an action in equity is appealed, it is the duty of this court to try the issues de novo and to reach an independent conclusion without reference to the findings of the district court. Comp. St. 1929, § 20-1925 (this section being now 25-1925, R. S. 1943). But in a case wherein the trial court has made a personal examination of the physical facts, and where, in the same case, the oral evidence in respect of material issues is so conflicting that it cannot be reconciled, this court will consider the fact that such examination was made and that such court observed the witnesses and their manner of testifying, and must have accepted one version of the facts rather than the opposite." City of Wilber v. Bednar, 123 Neb. 324, 242 N. W. 644. See, also, State v. Delaware-Hickman Ditch Co., 114 Neb. 806, 210 N. W. 279; Greusel v. Payne, 107 Neb. 84, 185 N. W. 336.

"The trial court is required to consider any competent and relevant facts revealed by a view of premises as evidence in the case, and a duty is imposed on this court on review of findings made by the trial court to give consideration to the fact that the trial court did view the premises; provided, that the record contains competent evidence to support the findings." Columbian Steel Tank Co. v. Vosika, 145 Neb. 541, 17 N. W. 2d 488.

In Carter v. Parsons, 136 Neb. 515, 286 N. W. 696, it is said: "As in the case of an inspection by a jury, any restrictions attempted to be imposed by an appellate court upon the effect which a trial court may give to such a view are purely artificial. Actually, it constitutes evidence, because the relevant and competent facts revealed thereby necessarily affect the mind of the trial judge and tend to produce belief or disbelief on an issue. * * * For this reason it may as well squarely be declared that the trial judge is entitled to make such a view a factor in his determination of the case. It follows also that this fact is entitled to consideration and weight in examining the evidence on appeal, although, of course, the record itself must contain competent evidence to support the findings of the trial court."

From an independent investigation of the record, and in view of the foregoing authorities, we conclude that the judgment of the district court should be, and is hereby, affirmed.

AFFIRMED.