J. C. DAUGHERTY, APPELLEE, V.
ASHTON FEED AND GRAIN CO., INC.,
A NEBRASKA CORPORATION, APPELLANT.

303 N.W.2d 64

Filed February 27, 1981.   No. 43171.

Perry, Perry, Witthoff & Guthery for appellant.

Norman E. Stephens & Donald R. Janousek for appellee.

Heard before KRIVOSHA, C.J., BOSLAUGH, McCOWN, CLINTON, BRODKEY, WHITE, and HASTINGS, JJ.

BRODKEY, J.

Ashton Feed and Grain Co., Inc., (Ashton Feed), the defendant below, appeals to this court from a permanant injunction entered on November 16, 1979, by the District Court of Sherman County, Nebraska, restraining it from operating certain fans and dryers in connection with its feed and grain storage business. The action seeking the injunction against Ashton Feed was brought by J. C. Daugherty, the appellee herein, who is the owner and resident of an 8-acre tract adjacent to the land upon which the business of Ashton Feed is located in rural Ashton, Nebraska. The record indicates that the appellee and his family have resided on their property since 1974. John Beall, president of Ashton Feed, stated that he acquired the grain elevator in Ashton in February of 1978, at which time it had a grain storage capacity of 175,000 bushels. Improvements were subsequently made to the facilities that year, which included the addition of twelve 55,000-gallon storage bins that increased the grain storage capacity of the elevator to over 800,000 bushels of grain. It also appears that two aeration fans were attached to each of the 12 bins for the purpose of controlling the moisture content in the bin in order to preserve the grain.

On October 24, 1978, Daugherty filed a "Petition for Temporary Restraining Order," with the District Court. In his petition, the appellee alleged: "5.0 That the Defendant has carried on, is still carrying on and threatens to continue carrying on the drying of the grain stored in the said bins by the use of two 28 horsepower aeration fans in each bin, which are used continuously; 6.0 That said fans have caused, still cause, and will continue to cause vibrations of the earth to take place and sundry great noises to continue night and day, thereby causing a serious change in the

character of Plaintiff's property, an injury which cannot be adequately compensated for in damages; 7.0 That the said noise and vibrations have interfered with and continue to interfere with the use and enjoyment of the Plaintiff's premises, have interfered with and continue to interfere with the comfort and enjoyment of the Plaintiff and his family in the occupation of their dwelling house situated on the Plaintiff's land, thereby making it difficult for them to sleep, have caused great disturbance to the livestock and dogs kept by the Plaintiff on his property, and have made it uncomfortable and impossible to enjoy the ordinary use of said premises and the dwelling house thereon, and to pursue the ordinary occupation of life thereon . . . ."

On October 24, 1978, the matter was submitted to the District Court, which granted a temporary restraining order "restraining the Defendant from operating any and all dryers and fans in such a manner as to interfere with the reasonable use and occupation of the Plaintiff's property by the Plaintiff upon the Plaintiff executing and undertaking in the sum of $3,000.00 as required by law." On November 2, 1978, at the hearing held for a temporary injunction, the parties stipulated that the defendant be allowed 6 months to make modifications to the fans to reduce the noise and provided that the plaintiff could reset the hearing on the temporary injunction within 10 days' notice to the defendant. An order to this effect was entered by the District Court, and the temporary restraining order of October 24, 1978, was dissolved.

It next appears that on April 11, 1979, the plaintiff moved to reset the hearing for the injunction; and on June 19, 1979, he filed an amended application in support thereof, alleging that the defendant had failed to reduce the noise nuisance within the time period stipulated by the parties.

This matter came to trial on July 13, 1979, at which time the court struck plaintiff's amended petition

and advised the parties that the case would proceed on plaintiff's original petition relating to the abatement of the noise nuisance. The record indicates that plaintiff presented his evidence that date and the trial was continued to October 25, 1979, at which time Ashton Feed presented its evidence. In its decree entered on November 16, 1979, the District Court found the noise emanating from Ashton Feed's feed-storage facility constituted a nuisance. In particular, the court stated:

"On this 16th day of November, 1979, upon consideration of the evidence and the briefs filed herein the Court finds that during 1978, the defendant erected 12 steel grain bins with ventilator fans on railroad right-of-way abutting plaintiff's land together with an unloading pit and two dryers. The unloading pit is approximately 97 feet from the plaintiff's residence. The defendant operates a feed and grain business and uses the dryers, the unloading pit, and the bins for the drying, unloading, and storage of grain which is their principal business. The plaintiff has lived in the residence since 1974. The evidence discloses that the fans on the bins are used irregularly during the year and they are used for longer periods during the harvesting season. Since the last hearing and as recently as one day prior to the last trial, the defendant has experimented with noise reduction by the erection of baffles designed to reduce the direct flow of sound from the bin fans toward plaintiff's residence. The plaintiff complains that the noise interferes with his reasonable use and occupancy of his residence and his enjoyment of his home where he lives with his wife and one son.

"The Court further finds that the plaintiff resides in the community of Ashton, Nebraska, which is a small rural community without the benefit of zoning laws. The plaintiff has somewhat of a rural residence and in his yard normally has approximately 30 hogs and 3 dogs.

"The layout of the bins and dryers shows that the

bins are arranged in two rows. One row of six closest to the center of the right-of-way have their fans pointed generally in the opposite direction of the plaintiff's house. The row of six farthest from the center of the right-of-way have their fans pointed out and away from the other bins and are directed generally toward the perimeter of the right-of-way and partially toward the residence of the plaintiff. The baffles recently erected by the defendant are partially effective in reducing the noise of the fans, but do not reduce the noise to such level as not to constitute a nuisance to the residential parties abutting the right-of-way.

"The Court further finds that had the defendant placed the bins on their leased area of the right-of-way with more space between bins, the defendant could have reasonably directed the fans toward the center of the right-of-way and away from the property of the plaintiff. The evidence indicates, however, that the bins are densely concentrated upon the leasehold leaving minimal space between the bins.

"In determining whether noise created by the defendant constitutes a private nuisance, the Court has considered the nature of the community and the nature of the residential area in which the plaintiff resides and the fact that improvements by the defendant are located upon railroad right-of-way. Further that presently the railroad only operates two trains a week upon such track.

"The Court finds that the operation of the fans on the bins and dryers can and does constitute a nuisance and unreasonably interferes with the use and occupancy of the plaintiff's residence."

Based upon the above findings, the court ordered that Ashton Feed be restrained from operating the bin fans and dryers on Saturdays and Sundays and between the hours of 8 p.m. to 7 a.m. during the week. The court also directed Ashton Feed to either baffle all the grain bin fans in the row closest to the plaintiff's property or relocate all the fans so they exhaust toward the center of the railroad right-of-way.

Ashton Feed's principal assignments of error in this appeal are that the trial court erred in finding that its operation of aeration fans located on the grain bins constituted a nuisance and in finding that the separate grain dryers were involved in the action and constituted a nuisance. Ashton Feed further assigns as error that the trial court erred in including its entire operation within the mandate of its judgment, and, also, in ordering that the fans and dryers not be operated on Saturdays.

We begin our discussion by setting forth the applicable law governing the scope of our review on appeal. This action, being one for a permanent injunction, will be heard de novo on appeal. Where an action in equity is appealed, it is the duty of this court to try the issues de novo and to reach an independent conclusion without reference to the findings of the District Court. *Prauner v. Battle Creek Coop. Creamery*, 173 Neb. 412, 113 N.W.2d 518 (1962); *Probert v. Grint*, 148 Neb. 666, 28 N.W.2d 548 (1947). This court has also held that there is no fixed or arbitrary rule governing cases of this class, and each case must be determined by the facts and circumstances developed therein. *Sarraillon v. Stevenson*, 153 Neb. 182, 43 N.W.2d 509 (1950); *Beisel v. Crosby*, 104 Neb. 643, 178 N.W. 272 (1920). As is stated in 58 Am. Jur. 2d *Nuisances* § 151 at 731-32 (1971): "An injunction against a nuisance is an extraordinary remedial process which is granted, not as a matter of right, but in the exercise of the sound discretion of the court, to be determined on a consideration of all the circumstances of each case . . . ."

We note that the operation of Ashton Feed is a lawful business under the law, and is not a nuisance per se. This does not mean, however, that it may not become a nuisance in fact, due to its operation of the storage facilities and/or its location within the community. See, *Horn v. Community Refuse Disposal, Inc.*, 186 Neb. 43, 180 N.W.2d 691 (1970); *City of Syracuse v.*

*Farmers Elevator, Inc.*, 182 Neb. 783, 157 N.W.2d 394 (1968). A legitimate business may become a nuisance by reason of the conditions implicit in and unavoidably resulting from its operation. *Sarraillon v. Stevenson, supra.* It is on this basis that the plaintiff contends that the noise created by the operation of Ashton Feed's grain bin fans is a nuisance.

It is generally recognized that under certain circumstances noise may constitute a nuisance and be enjoined. "Generally, noise is not a nuisance per se, but it may be of such a character as to constitute a nuisance in fact, which may serve as the basis of an action at law or in equity, even though it arises from the operation of a factory, industrial plant, or other lawful business or occupation . . . ." 58 Am. Jur. 2d *Nuisances* § 62 at 629-30 (1971).

Whether noise is sufficient to constitute a nuisance depends upon its effect upon an ordinary reasonable man, that is, a normal person of ordinary habits and sensibilities. Relief cannot be based solely upon the subjective likes and dislikes of a particular plaintiff, and relief must be based upon an objective standard of reasonableness. 66 C.J.S. *Nuisances* § 22 (1950); 58 Am. Jur. 2d *Nuisances* §§ 62, 64 (1971); *Smith v. Western Wayne Co. Assn.*, 380 Mich. 526, 158 N.W.2d 463 (1968); *Sarraillon v. Stevenson, supra; Prauner v. Battle Creek Coop. Creamery, supra.* In *Kellerhals v. Kallenberger*, 251 Iowa 974, 980, 103 N.W.2d 691, 694 (1960), the Supreme Court of Iowa stated: "To justify abatement of a claimed nuisance the annoyance must be such as to cause actual physical discomfort to one of ordinary sensibilities. Such an annoyance has been shown here. There is no basis for the conclusion plaintiffs are not of ordinary sensibilities. In this connection we have held it is presumed, in the absence of evidence to the contrary, that a plaintiff has ordinary sensibilities. [Citations omitted.]"

In its testimony at the trial, Ashton Feed attempted to prove that the Daughertys were not people of ordinary

sensibilities. Neil Sullivan, a witness testifying on behalf of Ashton Feed, testified with relation to noise levels at the Ashton Feed and Grain elevator; and, in reply to a question as to whether or not the noise from Ashton Feed's grain elevator would seriously disturb a person of ordinary habits and sensibilities, stated: "No, I do not think that that would normally offend an individual. I base that on a number of different studies in terms of what sound levels are present in the number of different areas." He expressed his opinion on the basis of decibel sound levels in various cities and under varying circumstances. In reply to the opinion expressed by the witness Sullivan, the court at that time stated: "I appreciate your efforts, but the Court wonders what difference it makes as to whether or not the level in the city of Ashton now approaches the average level in the city of Chicago. The real issue is this case, in this circumstance, in this community with those circumstances and not that it doesn't exceed the average of the United States of America. . . . I don't want to argue with your position but Riverdale and Ashton are probably different than where most of the people in the United States live. Maybe they're noisier." It is clear from the above-quoted evidence that the witness Sullivan was in no way testifying with regard to the sensibilities of the Daughertys themselves, but only whether, on the basis of various scientific tests he had performed in various cities and under varying circumstances, it would be his opinion that the sound levels at Ashton Feed would not offend a person of ordinary and normal sensibilities. The fact question presented on this issue was clearly for the decision of the trial court, which apparently was not convinced by Ashton Feed's evidence that the Daughertys were not people of ordinary sensibilities in view of the fact that it issued the injunction against Ashton Feed.

In the present case, plaintiff has presented evidence which indicates that Ashton Feed's grain storage

facility is in operation during the entire year and that the hours of such operation vary with the corn and wheat harvest. There is evidence in the record that the fans in question are used on an irregular basis during the year, and for a period of about 8 to 11 hours a day; but that the fans are used for longer periods during the harvesting season, and on occasions have even been operated 24 hours a day. Plaintiff's evidence reveals that not only have he and his family been deprived of sleep on occasions but that the noise also substantially interferes with the daily activities which occur within his home. The record indicates that in response to the stipulation entered into between the parties on November 2, 1978, Ashton Feed has attempted to reduce the noise emanating from the grain bin fans by regulating the hours that such fans are in use and by attempting to baffle the noise they create with insulation materials. While the regulations governing the hours the fans are in use appear to have relieved much of the complained nuisance, the baffling of the fans has proved ineffective. John Beall, president of Ashton Feed, testified that Ashton Feed tried to baffle the aeration fans by placing bales of hay around them, but that not all the fans were so insulated by the hay.

From the evidence found in the record on appeal, we agree with the trial court that the aeration fans operated by Ashton Feed on its bins constitute a nuisance and the hours of their use should be enjoined. We note that Ashton Feed is not being enjoined from operating a grain storage business, but solely restricted in the hours such fans on the bins and dryers can be operated. The rule is well settled that a court of equity has jurisdiction to enjoin a threatened injury whenever its nature is such that it cannot be adequately compensated in damages and its continuation would occasion a constantly recurring grievance. *City of Syracuse v. Farmers Elevator, Inc.*, 182 Neb. 783,

157 N.W.2d 394 (1968); *Lowe v. Prospect Hill Cemetery Ass'n.*, 58 Neb. 94, 78 N.W. 488 (1899).

We now consider Ashton Feed's assignment of error and contention that the court erred in including within the purview of its injunction Ashton Feed's entire operation, including not only the aeration fans but also the fans on the separate grain dryers. It is true that, in its original petition for a temporary restraining order, the plaintiff only complained about the noise from the operation of the aeration fans, and Ashton Feed thus argues that it was improper for the court to also enjoin the operation of the dryers. John Beall, the president and a stockholder of Ashton Feed, testified: "Mrs. Daugherty called me up and said that the fans were making a great deal of noise. I asked her if it might be the dryer and she said, no the dryer was not causing her any problems." However, Fred Vieth, the manager of the elevator, was asked on cross-examination: "One other thing you stated that Mrs. Daugherty had a conversation with you in which she said the dryer was — wasn't of a problem. Has she discussed the fans with you at any time?" To this question, Mr. Vieth answered: "Yes, they drive her up the wall." This clearly presented a fact question as to whether or not the operation of the dryer fans were part of the nuisance suffered by the Daughertys. The trial court obviously believed that the dryers were part of the noise problem, and it specifically found as follows in its injunction: "The court finds that the operation of the fans on the bins and dryers can and does constitute a nuisance and unreasonably interferes with the use and occupancy of the plaintiff's residence." Although a review in an equity case appealed to this court is de novo, we have also frequently stated that the court will consider the fact that the trial court observed the witnesses and their manner of testifying, and must have accepted one version of the conflicting evidence over the other. In this case, we agree with the conclusions of the trial court.

It must also be remembered that in plaintiff's original petition for a temporary restraining order, and also in his subsequent application for a restraining order, he prayed "for such other and further relief as the Court may deem just and equitable." A prayer for general equitable relief is to be construed liberally, and will often justify granting relief in addition to that contained in the specific prayer, provided it fairly conforms to the case made by the petition and the evidence. See *Kellerhals v. Kallenberger*, 251 Iowa 974, 103 N.W.2d 691 (1960). A court of equity can tailor its injunction to fit the circumstances of a particular situation. It is now established law in this jurisdiction that a court of equity which has obtained jurisdiction for any purpose may retain jurisdiction for the purpose of administering complete relief between the parties with respect to the subject matter. *Hull v. Bahensky*, 196 Neb. 648, 244 N.W.2d 293 (1976). It is clear that in the instant situation the trial court balanced the equities of the situation. It did not by its injunction restrain Ashton Feed from doing business, but, on the contrary, only limited the days and hours during which Ashton Feed was prohibited from operating its fans and dryers. It further ordered Ashton Feed to endeavor to correct this situation by use of baffles, etc., and apparently Ashton Feed has taken steps to endeavor to do so. Should the desirable result be obtained by virtue of improvements in sound insulation techniques, or for other reasons, Ashton Feed can at that time apply to the court for further relief.

In view of what we have stated above, we conclude that the trial court was correct in its judgment and decree, and must be affirmed.

AFFIRMED.