TRUDI R. HENKE, APPELLANT AND CROSS-APPELLEE, V.
ROBERT P. GUERRERO, APPELLEE AND CROSS-APPELLANT.
692 N.W.2d 762

Filed February 15, 2005. No. A-04-532.

338

Richard E. Gee for appellant.

Chris A. Johnson, of Conway, Pauley & Johnson, P.C., for appellee.

Sievers, Moore, and Cassel, Judges.

Sievers, Judge.

Trudi R. Henke appeals the order of the Hall County District Court establishing the paternity of and granting support for her minor child, Leauna L. Henke. Robert P. Guerrero, the putative father, cross-appeals the order of support. The matter of child support is complicated by the fact that Trudi and Robert both have spouses and children from their marriages.

## FACTUAL AND PROCEDURAL BACKGROUND

On June 5, 2000, Trudi gave birth to Leauna. At the time of Leauna's birth, Trudi was already married to Brian Henke. On July 31, 2002, Trudi filed a petition against Robert to establish paternity. On January 10, 2003, a hearing was held in the Hall County District Court on Trudi's motion for genetic testing. The court granted the motion and ordered testing of both Robert and Brian, but reserved the right to later assess costs for the testing. Following a hearing on the petition to establish paternity, the court entered an order on February 24, 2004, finding that Robert was Leauna's biological father and ordering child support. Only the matter of support is at issue in this appeal.

At the time of Leauna's birth, Robert was married, and he was still married at the time of the hearing. Robert and his wife have three children—a son born December 5, 1994, and twins born March 7, 2002. Trudi and Brian also were still married and have two other children born prior to Leauna's birth, one of whom is not Brian's biological child.

From February 10, 1997, to April 5, 2002, Robert was employed at Mayhew Signs, Inc., which is owned by Trudi's father. While employed at Mayhew Signs, Robert earned $13.50 per hour plus benefits. Within a week or two after quitting Mayhew Signs, Robert began working at another sign company where he earned $11.50 per hour without benefits. Robert's wife resigned from her job in July 2002 to stay at home and care for her and Robert's children. Robert was laid off from the second sign company on October 9, 2003. On December 2, he obtained employment with a

heating, air conditioning, and electrical company and was still employed there at the time of trial, earning $9.50 per hour without benefits. Robert has a high school diploma and received a certificate from an "electrical college" but does not have a degree.

Trudi is employed at Mayhew Signs as a graphic artist and salesperson. At the time of trial, she had been employed there for 10 years. Trudi's 2003 W-2 form shows her gross wages to be $25,616.22 before her retirement contribution, leaving $24,966.22 as taxable gross income. Her husband, Brian, is employed, and their housing and family health insurance are provided as a benefit of Brian's employment. No evidence of Brian's earnings was submitted at trial.

The trial court ordered Robert to pay child support for Leauna of $252 per month commencing on July 1, 2000. The court stated that his child support "[a]rrearages" shall be paid in the sum of $50 per month. The court also ordered Robert to pay $25 per month for "unpaid birth expenses" for Leauna of $276.94. The court ordered that Robert carry health insurance on Leauna "if available through his employment" and that he pay 38 percent of her annual noncovered health expenses above the first $480, which initial amount Trudi was to pay. Both parties were ordered to pay their own costs and fees. Trudi filed a motion for new trial on March 4, 2004. In a subsequent order on April 5, the court overruled the motion for new trial and modified its previous order by awarding Trudi one-half of the $700 genetic testing fee. Trudi timely appeals, and Robert cross-appeals.

## ASSIGNMENTS OF ERROR

Trudi asserts, reassigned and restated, that the trial court erred in (1) calculating Robert's child support obligation on the basis of his wage of $9.50 per hour at the time of trial rather than on the $13.50 per hour he earned before he quit Mayhew Signs; (2) refusing to admit exhibit 32, which showed the availability of jobs he could have applied for; (3) not reducing Trudi's income by the amount of her retirement contribution; (4) choosing a single monthly retroactive child support amount; (5) not ordering Robert to pay his share of Leauna's medical and childcare costs from her birth to the date of trial; (6) not ordering Robert to pay a percentage of Leauna's health insurance costs; (7) ordering visitation

when Robert actively opposed any effort to set up visits; (8) not ordering Robert to pay all of the costs of genetic testing; (9) not ordering Robert to pay a part of Trudi's attorney fees and costs; (10) not ordering Robert to post security for child support; and (11) refusing to admit exhibit 30, which pertained to life insurance.

On cross-appeal, Robert asserts, reassigned and restated, that the court erred in (1) awarding retroactive child support, (2) setting the amount of child support without considering the poverty guidelines in effect on the day of trial, and (3) ordering Robert to contribute to past medical birth expenses and future unreimbursed medical expenses and to acquire health insurance for Leauna if such insurance is available through his employment.

## STANDARD OF REVIEW

While a paternity action is one at law, the award of child support in such an action is equitable in nature. *State on behalf of Joseph F. v. Rial*, 251 Neb. 1, 554 N.W.2d 769 (1996). When reviewing a question of law, an appellate court reaches a conclusion independent of the lower court's ruling. *Id.* A trial court's award of child support in a paternity case will not be disturbed on appeal in the absence of an abuse of discretion by the trial court. *Weaver v. Compton*, 8 Neb. App. 961, 605 N.W.2d 478 (2000).

In child support cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Brockman v. Brockman*, 264 Neb. 106, 646 N.W.2d 594 (2002).

## ANALYSIS

*General Principles.*

Child support in a paternity action is to be determined in the same manner as in cases of children born in lawful wedlock. Neb. Rev. Stat. § 43-1402 (Reissue 2004). An out-of-wedlock child has the statutory right to be supported to the same extent and in the same manner as a child born in lawful wedlock; the resulting duty of a parent to provide such support may, under appropriate circumstances, require the award of retroactive child support. *State on behalf of Joseph F. v. Rial, supra; Weaver v. Compton, supra.* The requirement of support begins at the time of the birth

of the child, whether the child is born in lawful wedlock or other-wise. *Weaver v. Compton, supra.*

*Present Wage Versus Past Wage.*

Trudi asserts that the trial court erred in calculating Robert's child support based on his wage of $9.50 per hour at the time of trial instead of based on his earning capacity, because he volun-tarily left his previous employment paying $13.50 per hour. Paragraph D of the Nebraska Child Support Guidelines provides in part: "If applicable, earning capacity may be considered in lieu of a parent's actual, present income and may include factors such as work history, education, occupational skills, and job opportu-nities. Earning capacity is not limited to wage-earning capacity, but includes moneys available from all sources."

Child support may be based on a parent's earning capac-ity when a parent voluntarily leaves employment and a reduction in that parent's support obligation would seriously impair the needs of the children. *Claborn v. Claborn,* 267 Neb. 201, 673 N.W.2d 533 (2004). Additionally, earning capacity may be used as a basis for an initial determination of child support under the Nebraska Child Support Guidelines where evidence is presented that the parent is capable of realizing such capacity through rea-sonable effort. *Id.*

The trial court stated in its order that it used Robert's income at the time of trial to calculate child support. The court reasoned that it "rejects the testimony that [Robert] could be rehired at [Mayhew Signs] based upon the testimony of the parties pre-sented" and that it "further finds that [Robert] has made every effort to obtain employment at his job level and earning capac-ity." Robert testified that Trudi "forced" him to leave his job at Mayhew Signs. He also testified that he had applied for employ-ment at over 20 places and that he was looking for "better work." There was no evidence indicating that Robert resigned from his employment at Mayhew Signs to avoid paying child support or that he resigned in bad faith. It is perhaps self-evident that Robert's continuing to work for Trudi's father with Trudi at the same workplace is not realistic. Moreover, the trial court was in a better position than this court to hear and see the witnesses and assess the evidence. There was no abuse of discretion in basing

child support on Robert's income of $9.50 per hour at the time of trial.

*Evidence of Job Availability.*

Trudi argues that the court erred in not admitting exhibit 32, which comprised newspaper "clippings" of classified advertisements for various jobs. A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of that discretion. *Sharkey v. Board of Regents*, 260 Neb. 166, 615 N.W.2d 889 (2000). To constitute reversible error in a civil case, the admission or exclusion of evidence must unfairly prejudice a substantial right of a litigant complaining about such evidence admitted or excluded. *Big River Constr. Co. v. L & H Properties*, 268 Neb. 207, 681 N.W.2d 751 (2004).

Exhibit 32 consisted of individual advertisements for jobs that were cut from a newspaper and then attached to four sheets of paper, the entirety of which was then marked and offered as exhibit 32. Prior to offering the exhibit, Trudi testified on direct examination as follows:

Q . . . You have known [Robert] for many years, have you not?

A Yes, I have.

. . . .

Q And you know that he is a very talented young man and has a lot of job skills, isn't that right?

A Yes.

Q And because of that knowledge, when you found out that he had been laid off . . . did you begin to watch the newspaper for possible jobs that he could apply for?

A Yes.

Q And did you go through the newspaper methodically and clip out the clippings that you felt would be jobs that he would be qualified for?

A Yes.

Trudi's counsel then offered exhibit 32, to which Robert objected on the bases of relevancy and foundation. The court sustained the objection, and no other testimony regarding the exhibit was elicited; nor was any limited offer of the exhibit made.

The only foundation established for exhibit 32 was that Trudi knew Robert's skills and found jobs advertised in the newspaper for which she "felt" he was qualified. However, the numerous advertisements in exhibit 32 contain various job descriptions, only some of which specify required skills. The foundational evidence for the exhibit was Trudi's testimony that Robert was "talented" with "a lot of job skills" and that she "felt" he was qualified for the jobs shown on exhibit 32—plus Robert's brief testimony about his "electrical college" certificate. One of the advertisements was for a "Field Research Technician." It stated that the employer offering the position "preferred" that a candidate have "[e]xperience with corn production, farm equipment and computers." There was no evidence that Robert had any such experience. Additionally, there was no showing that all the jobs on exhibit 32 paid more than Robert's position at the time of trial. In fact, one of the advertisements, for "Inventory Specialists," provided that the work was part time with earnings of "up to $8 per hour to start." This was less than the $9.50 per hour Robert was making working full time. The foundation for the admission of exhibit 32 was clearly inadequate. Moreover, while our examination of the exhibit reveals that some of the clippings had relevance, some did not, and the offer was of the entire four pages composing the exhibit. The trial court did not abuse its discretion in sustaining the objection to the admission of exhibit 32.

*Retirement Exclusion.*

Trudi asserts that the trial court erred in not excluding her retirement contribution from her gross income when calculating child support. Paragraph E(4) of the child support guidelines provides for a deduction for certain retirement contributions:

> Retirement. Individual contributions, in a minimum amount required by a mandatory retirement plan. Where no mandatory retirement plan exists, a deduction shall be allowed for a continuation of actual voluntary retirement contributions not to exceed 4 percent of the gross income from employment or 4 percent from the net income from self-employment.

Although Trudi argues that the court did not reduce her gross income by the amount of her retirement contribution, the trial court used a monthly wage of $2,083.02, which amounts to $24,996.24 annually. This figure reflects Trudi's taxable income after the

retirement contribution is deducted. Had the trial court used Trudi's gross wage before retirement was deducted, $25,616.22 as reflected by her 2003 W-2 form, the worksheet would have stated a monthly income of $2,134.69. In short, on the child support worksheet used by the trial court, the amount Trudi contributed to retirement had been subtracted from her "Total Monthly Income (Taxable)" instead of listed under "Other Deductions." Thus, the trial court accounted for Trudi's retirement contribution. Trudi's argument is without merit.

*Trial Court's Order for Retroactive Support.*

 Robert argues in his cross-appeal that the award of retroactive support was error because the claim for such support was not pled in Trudi's petition and because such claim was not brought in Leauna's name. Neb. Rev. Stat. § 43-1411 (Reissue 2004) provides in part that an action to establish paternity may be brought by the mother of the child within 4 years after the child's birth. The Nebraska Supreme Court in *Doak v. Milbauer*, 216 Neb. 331, 343 N.W.2d 751 (1984), held that § 43-1411 indicates that a paternity action need not be brought on behalf of the child if the mother brings the suit on her own behalf within 4 years of the child's birth. Further, under Neb. Rev. Stat. § 43-1412(3) (Reissue 1998), if a judgment is entered in a paternity action declaring the alleged father to be the father of the child, "the court shall retain jurisdiction of the cause and enter [an] order of support, including the amount, if any, of any court costs and attorney's fees."

 In *Weaver v. Compton*, 8 Neb. App. 961, 605 N.W.2d 478 (2000), we said that an out-of-wedlock child has the statutory right to be supported to the same extent and in the same manner as a child born in lawful wedlock and that the resulting duty of a parent to provide such support may, under appropriate circumstances, require the award of retroactive child support. The requirement of support begins at the time of the birth of the child, whether the child is born in lawful wedlock or otherwise. *Id.* Clearly, retroactive support is included in the "support" that the trial court may order under § 43-1412(3). Therefore, we find that if the mother brings the paternity action within 4 years, she need not bring it on behalf of the child and the court may award retroactive support under § 43-1412(3).

Here, Trudi filed a petition on her own behalf for paternity within 2 years of Leauna's birth; thus, she was not required to bring the action on behalf of Leauna. In her petition, Trudi prayed only for an order finding Robert to be Leauna's biological father and "for such other relief as may be allowed by law or equity." At the hearing, there was evidence admitted regarding both future support and retroactive support. In fact, Robert submitted exhibit 37, a child support calculation specifically for retroactive support. Thus, the issue of retroactive support was tried.

Trudi's petition prayed for "such other relief as may be allowed by law or equity," and child support is equitable relief, see *Gangwish v. Gangwish*, 267 Neb. 901, 678 N.W.2d 503 (2004), which, as said, can be awarded by the court upon determination of paternity under § 43-1412(3). Thus, Trudi need not have specifically requested child support in order for the court to award such support. See, *City of Beatrice v. Goodenkauf*, 219 Neb. 756, 366 N.W.2d 411 (1985) (action in equity vests trial court with broad powers authorizing any judgment under pleadings); *Daugherty v. Ashton Feed and Grain Co., Inc.*, 208 Neb. 159, 303 N.W.2d 64 (1981) (prayer for general equitable relief is to be construed liberally, and will often justify granting relief in addition to that contained in specific prayer, provided it fairly conforms to case made by petition and evidence). Therefore, Trudi's general pleading requesting "other relief" was sufficient for the court to award child support and retroactive support, and the parties clearly tried the issue of retroactive support. Robert's arguments on cross-appeal that the court erred in awarding retroactive support because the claim therefor was brought by Trudi on her own behalf rather than on Leauna's and because it was not pled for in Trudi's petition are without merit.

### Amount of Retroactive Support.

Trudi asserts that "[i]t was error to pick a single per monthly [sic] child support figure to be paid retroactively rather than what the amount should have been as the various children were born." In contrast, Robert asserts on cross-appeal that the court erred in ordering retroactive support because the court failed to consider the poverty guidelines and Robert's ability to pay retroactive support. We combine these claims for discussion.

Paragraph R of the Nebraska Child Support Guidelines states: Basic Subsistence Limitation. A parent's support, child care, and health care obligation shall not reduce his or her net income below the minimum of $776 net monthly for one person, or the poverty guidelines updated annually in the Federal Register by the U.S. Department of Health and Human Services under authority of 42 U.S.C. § 9902(2), except minimum support may be ordered as defined in paragraph I above.

The trial court ordered Robert to pay support of $252 per month "commencing on July 1, 2000," the month after Leauna's birth. Such order would produce arrearages of $10,836 calculated from July 1, 2000, to February 1, 2004 (the first day of the month following Leauna's birth through the last month before the order). Then, later in its order, the trial court stated that the "[a]rrearages in child support shall be paid in the sum of $50 per month, commencing March 1, 2004, and on the first day of each and every month thereafter until the arrearages have been paid in full with any interest accruing thereon." Without considering interest, it would take Robert 18 years to pay the arrearages at that rate. We assume that in ordering the "arrearages" to be paid, the trial court meant retroactive support, the obligation therefor beginning July 1, 2000. See *Weaver v. Compton*, 8 Neb. App. 961, 605 N.W.2d 478 (2000).

Robert argues that the trial court failed to consider his financial inability to pay any retroactive support. A similar argument was raised by the father in *Lawson v. Pass*, 10 Neb. App. 510, 633 N.W.2d 129 (2001). The father in *Lawson* argued that *Cooper v. Cooper*, 8 Neb. App. 532, 598 N.W.2d 474 (1999), supported the idea that retroactive support should be awarded depending on the parent's ability to pay. In *Cooper*, we quoted the proposition from the Nebraska Supreme Court's opinion in *Faaborg v. Faaborg*, 254 Neb. 501, 576 N.W.2d 826 (1998), that " '[i]n determining the amount of a child support award, this court has consistently held that the trial court must consider the status, character, and situation of the parties and attendant circumstances, including the financial condition of the parties and the estimated cost of support of the children.' " 8 Neb. App. at 537-38, 598 N.W.2d at 478. And, in discussing the lump-sum payment of

child support which necessarily results from an order of retroactive support, we expanded upon the above-quoted excerpt from *Faaborg*, holding that in awarding retroactive support, "the ability to pay is a paramount factor." *Cooper v. Cooper*, 8 Neb. App. at 538, 598 N.W.2d at 478.

Our conclusion in *Cooper* was that "in the absence of a showing of bad faith, it is an abuse of discretion for a court to award retroactive child support when the evidence shows the obligated parent does not have the ability to pay the retroactive support and still meet current obligations." 8 Neb. App. at 538, 598 N.W.2d at 478. However, in *Lawson v. Pass, supra*, we noted that *Cooper* was a modification of a divorce decree, as was *Faaborg v. Faaborg, supra*, whereas *Lawson* involved child support ordered in a paternity decree. In *Riggs v. Riggs*, 261 Neb. 344, 622 N.W.2d 861 (2001), the Nebraska Supreme Court seemed to at least tacitly endorse the concept in *Cooper* that circumstances may exist where a noncustodial parent lacks the ability to pay retroactive child support and still meet current obligations. But, in *Lawson*, we said:

> [N]either *Riggs* nor *Cooper* makes it totally clear whether such a finding [of inability to pay] means that no retroactive support should be awarded or that the court should devise a payment plan as was attempted here. Additionally, *Cooper* was a modification of divorce support order, and whether the doctrine under discussion applies in a paternity setting was not decided.

10 Neb. App. at 519, 633 N.W.2d at 137. Nonetheless, we determined in *Lawson*, "[T]he . . . evidentiary record does not support the conclusion that under *Riggs* and *Cooper*, [the father] should be relieved of all retroactive child support, even if we were to hold that the *Cooper* doctrine applies to the retroactive portion of child support in a paternity case—a matter we do not decide." 10 Neb. App. at 519, 633 N.W.2d at 137-38.

With that history in place, we find ourselves faced with an evidentiary record in this case that compels that we further delineate the consequences in a paternity action of a noncustodial parent's inability to pay. The choices appear to be that there is then simply no duty to pay retroactive support or that the amount of retroactive support can be reduced as a deviation from the guidelines and

a payment plan ordered for a parent who is financially unable to satisfy a judgment for the entirety of the retroactive support owed.

The law is firmly established that "children born out of wedlock are entitled to the same duty of support as children born in wedlock. . . . A child born out of wedlock is entitled to child support retroactively to the date of birth, because it is upon the child's birth that the parental duty of support commences." *Willers v. Willers*, 255 Neb. 769, 778, 587 N.W.2d 390, 396 (1998). See, also, *State on behalf of Joseph F. v. Rial*, 251 Neb. 1, 554 N.W.2d 769 (1996); *Weaver v. Compton*, 8 Neb. App. 961, 605 N.W.2d 478 (2000). Because the award of child support is an equitable proceeding, and because child support in a paternity action is to be determined in the same manner as in cases of children born in lawful wedlock, a parent's ability to pay retroactive support, among other things, must be considered when awarding such support.

The paramount concern and question in determining child support is the best interests of the child. See *Peter v. Peter*, 262 Neb. 1017, 637 N.W.2d 865 (2002). But, in the instant case, because of unusual circumstances, we also must consider that there are multiple families involved. See *Brooks v. Brooks*, 261 Neb. 289, 622 N.W.2d 670 (2001) (court may deviate from child support guidelines under some circumstances when subsequent children are involved; however, court should adhere to idea that both families should be treated as fairly as possible). Although this is not a multiple-family case based on a remarriage, it is about as complex a multifamily situation as we can imagine.

The court in *Riggs v. Riggs*, 261 Neb. 344, 622 N.W.2d 861 (2001), held that depending on the equities of the situation, a court may determine whether support should be applied retroactively in modification cases; but this holding was made in the context of the retroactivity of a modified previously existing child support order in a divorce case. Here, retroactivity is at issue in an initial support order in a paternity case. We think that we must operate from the now well-established premise that the out-of-wedlock child is entitled to the same support as the child born in wedlock. In the latter instance, there is neither authority nor justification for dispensing entirely with the obligation to pay support, and thus, there cannot be a different rule in paternity actions. Accordingly, the inability to pay retroactive support in a paternity

case does not obviate the obligation, but, rather, the consequences of such inability are to be handled in the context of the Nebraska Child Support Guidelines, which are applicable to paternity actions. As a result, in a paternity case, the father's inability to pay retroactive support means that after assessing the equities of the case, the court can deviate from the child support guidelines in setting retroactive support, and because it is an equity matter, the court can also order a payment plan for the retroactive support.

We now consider the equities in the present case. Trudi has two other children, and her 2003 gross monthly income, according to the trial court, was $2,083.02. Trudi's husband, Brian, works full time, although there was no evidence of his income; but housing and health insurance for his family, including Leauna, are provided as part of Brian's compensation, at a cost of $708.38 per month for the family's five members. There is no evidence that Leauna has unmet needs or special needs.

Robert earns $9.50 per hour, which calculates to $1,646.67 per month ($9.50 × 40 hours = $380/week × 52 weeks = $19,760/year ÷ 12 months = $1,646.67/month). His wife does not work outside the home, as she stays home to care for her and Robert's three children. Neither Robert nor his wife currently has health insurance, and it is not offered through Robert's employer. Their children are "on Medicaid." The 2003 version of paragraph R of the child support guidelines, which paragraph is entitled "Basic Subsistence Limitation" and was in effect at the time of trial, provided that the monthly income for one person shall not be reduced below $748. Robert's monthly net income of $1,048.97 (as determined by the trial court in its child support worksheets), when reduced by child support of $252 and a retroactive support payment of $50, leaves him with a monthly income which is $1.03 below the basic subsistence limitation.

Although the trial court allowed for the retroactive support to be paid at the rate of $50 per month, the total arrearages at $252 per month beginning July 1, 2000, through February 1, 2004, would be $10,836. Without figuring interest, it would take Robert 18 years at $50 per month to pay the debt, and at his earning level, the burden of this debt over nearly a 20-year timespan—during which Robert must also meet current obligations for a family of five—creates an untenable financial situation.

Therefore, the equities require that retroactive support be set after a deviation from the child support guidelines, because even the nominal amount of $50 per month for child support under the guidelines drops Robert below the poverty guideline when his present obligation of $252 per month in current support is taken into account. Therefore, a retroactive support obligation of $252 per month beginning July 1, 2000, is simply too much. The simple reality of this case is that given Robert's position on the earnings ladder, his earnings are not adequate for us to be able to say that all of his children are being treated fairly and equally under the trial court's order. At $252 per month in current support plus $50 per month toward retroactive support, 29 percent of Robert's monthly net income will be devoted to Leauna even though he has three other children. This is a disproportionate amount of his net income for Leauna when the needs of his other three children are considered. And, while Robert's role in creating this situation is obvious, our concern has to be for fairness for all the children—recognizing that neither party should expect the courts to produce a perfectly fair economic result. The simple truth is that there is not enough money. The circumstances and the equities, principally Robert's lack of ability to pay and the needs of his other children, require that there be a deviation from the guidelines as to retroactive support. The appropriate deviation is to set the retroactive support at the "nominal" level found in the guidelines—$50 per month.

We modify the trial court's award of retroactive support to $50 per month, the minimum support allowed for a child under the guidelines. Such support obligation shall begin July 1, 2000, and run through February 1, 2004, the month before the decree was entered. See Maddux v. Maddux, 239 Neb. 239, 475 N.W.2d 524 (1991). Thus, the total amount of retroactive support to be paid is $2,150. Beginning March 1, 2004, Robert must pay $252 per month in current child support for Leauna, plus $50 per month applied against his retroactive support arrearage of $2,150.

*Childcare and Medical Care Costs.*

Trudi asserts that the court erred in not ordering Robert to pay past medical or daycare expenses for Leauna from her date of birth until trial. In *Weaver v. Compton*, 8 Neb. App. 961, 605 N.W.2d 478 (2000), the mother asserted on appeal that the trial court erred

in not ordering the father to pay daycare or medical expenses dating back to the minor child's birth. We found in *Weaver* that the child support guidelines instructed that childcare should be considered independently of the support amount. We also determined that the mother had neither "allege[d] the amount of day-care or prepetition medical expenses, nor . . . request[ed] them in her petition." *Id.* at 970-71, 605 N.W.2d at 485. Therefore, the *Weaver* court found, it was not error for the trial court to have failed to grant relief that was not requested in the petition.

Here, Trudi also did not request recovery of daycare or medical expenses in her petition. Her petition was "to [e]stablish [p]aternity" and did not set forth any allegations as to daycare or medical expenses, although she submitted evidence of the expenses at the hearing. The petition simply prayed for a finding that Robert is Leauna's biological father and "such other relief as may be allowed by law or equity." Although Trudi's general request for relief may be sufficient to justify an award of relief, it is not sufficient for her to attack the trial court's failure to award specific relief for which she did not ask. In the absence of appropriate pleadings seeking and justifying an award, a trial court cannot err by failing to award such relief. *Kovanda v. Vavra,* 10 Neb. App. 486, 633 N.W.2d 576 (2001). See, also, *Weaver v. Compton, supra.* Trudi's argument is without merit.

*Health Insurance.*

Paragraph O of the Nebraska Child Support Guidelines provides in part that "[c]hildren's health care expenses are specifically included in the guidelines amount of up to $480 per child per year. Children's health care needs are to be met by requiring either parent to provide health insurance as required by state law." The trial court ordered Robert to "carry health insurance on [Leauna], if available through his employment." The court also ordered that Trudi pay the first $480 of annual noncovered health-related expenses, and any other noncovered expenses were to be paid 62 percent by Trudi and 38 percent by Robert.

Trudi asserts that the court erred in not requiring Robert to pay a percentage of Leauna's health insurance costs "where he voluntarily left Mayhew Signs where he had health insurance available to him." Robert argues on cross-appeal that it was error to order him to pay even 38 percent of noncovered expenses above

the first $480 or carry health insurance if it is available through his employment.

Because paragraph O of the child support guidelines provides that "either parent" must carry health insurance on the child, the trial court had discretion in determining which parent should pay for it. The trial court obviously found that Trudi was better situated than Robert to carry health insurance for Leauna, and we agree. The record indicates that Brian's employer provides Trudi and Brian's family with health insurance; plus, both Trudi and Brian work full time. There was no evidence of any extra cost to carry Leauna on Brian's policy, and in these circumstances, such evidence would appear to be desirable to support a claim of an abuse of discretion in how the trial court handled the health insurance. At the time of trial, Robert's current employer did not provide health insurance, and Robert did not carry health insurance for his other three children, himself, or his wife. We have already determined that Robert did not leave Mayhew Signs in bad faith—thus, his leaving his previous employment cannot, by itself, be a basis for ordering him to pay health insurance costs.

Turning to Robert's complaint on this issue, we note that paragraph O of the child support guidelines, regarding health insurance, is subject to paragraph R of the guidelines, the basic subsistence limitation guideline. *Kearney v. Kearney*, 11 Neb. App. 88, 644 N.W.2d 171 (2002). With just the monthly payments of current support and $50 in retroactive support, Robert falls below the poverty level. Therefore, the trial court erred in ordering Robert to carry health insurance if it becomes available through his employment and to pay 38 percent of all Leauna's noncovered medical expenses beyond the first $480 annually. We vacate this portion of the trial court's order.

*Visitation.*

Trudi asserts that the trial court erred in awarding Robert "reasonable visitation" because Robert "actively opposes any effort to set up visits."

> [T]he relationship between a parent and child is a constitutionally protected one and . . . although the father of a child born out of wedlock need not be treated in all respects as is the father of a child born in wedlock, the relationship

between an unwed father and his child is not devoid of constitutional protection.

*White v. Mertens*, 225 Neb. 241, 244, 404 N.W.2d 410, 413 (1987). Visitation of a child born out of wedlock is to be decided on the basis of what is in the best interests of the child and depends upon the existence of a familial relationship with the child. *White v. Mertens, supra.*

There was no evidence showing that it was in Leauna's best interests to have visitation with Robert. Robert did not request visitation. Although the record does not contain evidence showing that Robert "actively opposes" visitation, the court erred in granting visitation without any evidence that there is a "familial relationship" with Leauna or that it is in her best interests. Therefore, we modify the trial court's order by vacating the award of reasonable visitation. This result is without prejudice to a later application for visitation supported by proper evidence.

*Genetic Testing.*

Trudi asserts that Robert should have paid all the costs for genetic testing as provided by Neb. Rev. Stat. § 43-1418 (Reissue 2004). Section 43-1418 states:

> In cases where the court orders genetic testing at the request of a party, the requesting party shall initially pay such expense. In cases where the court orders genetic testing in the absence of a request of any party, the assessment of the cost of such testing shall be determined by the court. Whenever the disputing party prevails, the costs shall be borne by the other party.

The trial court modified its original order entered February 24, 2004, to provide that Robert shall pay one-half of the $700 genetic testing fee.

Trudi argues that the statute suggests that "if a party disputes paternity (Robert) then the disputing party should pay the costs if they [sic] lose." Brief for appellant at 21. However, Robert argues that because the statute does not specifically indicate what happens when the disputing party loses, it is within the discretion of the trial judge to determine costs. Statutory interpretation presents a question of law. When reviewing questions of law, an

appellate court has an obligation to resolve the questions independently of the conclusion reached by the trial court. *Mathews v. Mathews*, 267 Neb. 604, 676 N.W.2d 42 (2004).

In the absence of anything to the contrary, statutory language is to be given its plain and ordinary meaning. *Id.* An appellate court will not resort to interpretation to ascertain the meaning of statutory words that are plain, direct, and unambiguous. *Id.* A court must place on a statute a reasonable construction which best achieves the statute's purpose, rather than a construction which would defeat that purpose. *Id.* In construing a statute, a court must look to the statutory objective to be accomplished, the evils and mischiefs sought to be remedied, and the purpose to be served, and then must place on the statute a reasonable or liberal construction that best achieves the statute's purpose, rather than a construction that defeats the statutory purpose. *Id.*

Here, the court ordered genetic testing at Trudi's request, based on her petition to establish paternity and her subsequent "Motion for Testing." Robert was the disputing party—Trudi alleged in her petition that he was the "biological father" of Leauna, and he denied such paternity in his answer. He did not "prevail" in the dispute, because he was found to be Leauna's father. Trudi asks us to hold that if the disputing party does not prevail, the disputing party must pay all the costs of the genetic testing. We do not see that as a reasonable interpretation of the statute.

Instead, a reasonable interpretation of the statute is that it is within the discretion of the trial judge to determine costs if the disputing party loses. See, generally, *Morrill County v. Darsaklis*, 7 Neb. App. 489, 584 N.W.2d 36 (1998) (appellate courts review awards of costs in paternity actions for abuse of discretion). There can be reasonable grounds for disputing paternity, for example, that the mother is married, and in such or similar situations, the trial court should have the discretion to award costs of paternity testing to achieve a fair and tenable result. Here, the court split the costs between the disputing party and the prevailing party. Given the circumstances, this was not an abuse of discretion.

*Attorney Fees.*

In a paternity action, attorney fees are reviewed de novo on the record to determine whether there has been an abuse

of discretion by the trial judge. Absent such an abuse, the award will be affirmed. *Weaver v. Compton*, 8 Neb. App. 961, 605 N.W.2d 478 (2000); *Morrill County v. Darsaklis, supra*. As a general rule, attorney fees and expenses may be recovered in a civil action only where provided for by statute or when a recognized and accepted uniform course of procedure has been to allow recovery of attorney fees. *Salkin v. Jacobsen*, 263 Neb. 521, 641 N.W.2d 356 (2002). Attorney fees are authorized in a paternity action under § 43-1412(3):

> If a judgment is entered . . . declaring the alleged father to be the father of the child, the court shall retain jurisdiction of the cause and enter [an] order of support, including the amount, if any, of any court costs and attorney's fees which the court in its discretion deems appropriate to be paid by the father.

The trial court ordered that "[e]ach party shall pay [his or her] own fees and costs." Based on the financial circumstances of the parties, it was not an abuse of discretion for the trial court to order the parties to pay their own fees and costs.

*Security and Exhibit 30.*

Trudi asserts that the trial court erred in not ordering Robert to post security for his child support. Neb. Rev. Stat. § 42-371(6) (Cum. Supp. 2002) authorizes the posting of security to insure the payment of child support. *Casselman v. Casselman*, 204 Neb. 565, 284 N.W.2d 7 (1979); *Muller v. Muller*, 3 Neb. App. 159, 524 N.W.2d 78 (1994). Trudi does not tell us where the money for such security would come from, and Robert plainly has no extra funds. The Nebraska Supreme Court in *Casselman v. Casselman, supra*, held that it was valid to order a person to post security to insure payment of a child support obligation. However, the *Casselman* court stated that "reasonable security for payment of . . . child support should be invoked only when compelling circumstances require it." 204 Neb. at 568, 284 N.W.2d at 9. In *Casselman*, the court found the compelling circumstances at issue to be

> almost total failure of the defendant to voluntarily pay the child support and alimony since entry of the decree; the plaintiff has suffered considerable trouble, expense, and

> many extraordinary proceedings, including contempt citations, garnishments, and executions; and there appears to be no attempt by the defendant to comply with the order of the court.

*Id.*

Here, the only allegedly "compelling circumstances" Trudi offered were (1) that her ex-husband, the father of one of her children, died in a car accident and she now has no support from him and does not want the same thing to happen with Robert and (2) that although "Robert was ordered to pay $74.00 a month child support beginning in October of 2003," brief for appellant at 22, he had only made one payment by the time of trial. Although the latter fact does not bode well for voluntary payments, it is not so compelling that we think security must be ordered from Robert's meager resources—although later events could make it compelling. The trial court did not abuse its discretion in refusing to order security for child support payments.

Trudi also asserts that the court erred in refusing to admit exhibit 30, which was evidence of the cost of life insurance for Robert. Robert objected to exhibit 30 on the bases of relevance and foundation, and the court sustained the objection. While the exhibit had some relevancy, the failure to admit it was not prejudicial, because there is no evidence that Robert can afford to buy a life insurance policy and still meet his other obligations. See *Big River Constr. Co. v. L & H Properties*, 268 Neb. 207, 681 N.W.2d 751 (2004) (to constitute reversible error in civil case, admission or exclusion of evidence must unfairly prejudice substantial right of litigant complaining about such evidence admitted or excluded). Therefore, the trial court did not abuse its discretion in excluding exhibit 30.

*Birth Expenses.*

Robert asserts on cross-appeal that the trial court erred in ordering him to contribute to the birth expenses for Leauna. The trial court ordered Robert to pay $276.94, at the rate of $25 per month, for unpaid birth expenses. Neb. Rev. Stat. § 43-1407 (Reissue 2004) provides:

> The father of a child shall also be liable for the reasonable expenses of the mother of such child during the period

of her pregnancy, confinement and recovery. Such liability shall be determined and enforced in the same manner as the liability of the father for the support of the child.

The liability for the support of a child is to be established by either judicial proceedings or acknowledgment. See § 43-1402. Such support shall be provided to the same extent for a child born out of wedlock as it is provided to a child born in lawful wedlock. *Id.* Trudi testified that she incurred $553.88 in uninsured medical expenses for Leauna's birth. Given the amount of expenses at issue and the dictates of § 43-1407, we cannot say that the trial court abused its discretion in determining that Robert owed Trudi half of the unpaid birth expenses—$276.94—paid at $25 per month.

## CONCLUSION

We modify the trial court's award of retroactive support so that it is $50 per month from July 1, 2000, through February 1, 2004, for a total of $2,150, payable at the rate of $50 per month, with applicable interest. Beginning March 1, 2004, Robert must pay $252 per month in child support for Leauna, as ordered by the trial court, and the above-stated $50 per month on the arrearages of retroactive support. We vacate the portion of the trial court's order which requires Robert to carry health insurance for Leauna if it becomes available through his employment and to pay 38 percent of all Leauna's noncovered health expenses beyond the first $480 annually. We vacate the trial court's award of reasonable visitation. The trial court's order is affirmed in all other respects.

AFFIRMED IN PART, AFFIRMED IN PART
AS MODIFIED, AND IN PART VACATED.