IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE ON BEHALF OF SAMANTHA P. V. ZACHARY R.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA ON BEHALF OF SAMANTHA P., APPELLEE AND CROSS-APPELLANT,

V.

ZACHARY R., APPELLANT AND CROSS-APPELLEE.

Filed November 22, 2022.    No. A-22-222.

Appeal from the District Court for Buffalo County: JOHN H. MARSH, Judge. Affirmed as modified.

Nathan P. Husak, of Bruner Frank, for appellant.

Nicole M. Mailahn and Allison R. Seiler, of Jacobsen, Orr, Lindstrom & Holbrook, P.C., L.L.O., for appellee.

MOORE, RIEDMANN, and BISHOP, Judges.

MOORE, Judge.

## INTRODUCTION

Zachary R. appeals from an order of the district court for Buffalo County, which awarded Samantha P. primary physical custody of the parties' children. The court also set a parenting time schedule and modified a previous award of child support to Samantha. On appeal, Zachary asserts that the court abused its discretion by not awarding the parties joint physical custody of the children, not awarding him reasonable parenting time, and not adopting a joint custody child support calculation. Samantha has cross-appealed, asserting that the court erred in not applying the child support modification retroactively. For the reasons set forth herein, we affirm as modified.

## STATEMENT OF FACTS

The parties have never been married to each other. Lua P. was born to the parties in 2010. This paternity action was initiated in March 2012 when the State of Nebraska filed a complaint to establish child support for Lua. In June, the district court entered an order for support, finding that Zachary was Lua's father and ordering him to pay child support to Samantha of $250 per month. Subsequently, Parker P. was born to the parties in 2013. After the State filed a complaint to modify, the court entered an order in March 2017, finding that Zachary was Parker's father and increasing Zachary's child support obligation to $618 per month. The court's calculation was based on "the historical earnings of the [parties]" and assigned a total monthly income of $2,426.67 to each of the parties. Zachary's child support obligation was suspended on April 11, 2017 (the parties lived together with the children in Texas at that point), and then support was reinstated on September 28, 2020 (after the parties separated and were no longer residing together).

On March 5, 2021, Zachary filed a third party complaint against Samantha, seeking to establish custody and parenting time. He asked the court to grant him both temporary and permanent legal and physical custody of the children, or alternatively, to grant the parties joint custody. He also asked the court to revise, modify, and reallocate child support, nonreimbursed health care expenses, and childcare expenses.

On April 5, 2021, Samantha filed a third party answer and counterclaim, seeking modification of Zachary's child support on a temporary and permanent basis, along with temporary and permanent custody of the children. She filed an amended third party answer and counterclaim on April 15, in which she specifically alleged that, since entry of the March 2017 child support order, there had been a material change in circumstances in that Zachary's income had increased. She again asked the court for temporary and permanent custody and child support and other equitable relief.

The district court entered a temporary order on April 19, 2021. The court granted Samantha temporary legal and physical custody of the children subject to Zachary's parenting time based on "what appears to have been the prior practice of the parties." Zachary's temporary parenting time was to occur on Monday, Wednesday, and Thursday from 3:30 p.m. to 5:30 p.m.; on Tuesday from 3:30 p.m. to 6:30 p.m.; on alternating weekends from 5:30 p.m. Friday until 6:30 p.m. Sunday; and on alternating holidays. The court also granted Zachary 3 weeks of summer parenting time. The court found that a recalculation of child support was more appropriate for final hearing, and it observed that modification of child support may be made retroactive to the time of filing.

On June 21, 2021, Samantha filed a motion for temporary orders, asking the district court to address the parties' responsibilities for health insurance, nonreimbursed health care and childcare expenses, as well as the issue of parental communication, none of which had been addressed by the court's April 19 temporary order. On July 29, the court entered an order approving the parties' stipulation that Zachary was to provide health insurance for the children, pay half of childcare expenses, and pay half of nonreimbursed medical expenses for the children after Samantha covered the first $250. The stipulation approved by the court also set forth provisions addressing parenting communication, including that the primary form of communication between the parties was to be by email, except in the event of an emergency, in which case they were to call by phone.

Trial was held before the district court on December 16, 2021. The court heard testimony from the parties, Samantha's boyfriend, and certain other witnesses, and the court received various exhibits into evidence.

The parties began dating in 2007, and they temporarily broke up several times before their final separation in February 2020. Samantha has been the primary caretaker for the children at most points since their birth. Between 2007 and 2015, the parties lived in Nebraska, sometimes together and sometimes separately, and had various employments. Zachary was also in a band, and the band performance schedule required him to be away from home some evenings and late nights and to take occasional trips out of town. By the time of the trial, however, Zachary was only involved in band activity about four times per year.

At some point, Zachary suggested a move to Texas and Samantha agreed since she had family there. The parties lived in Texas between August 2015 and September 2017. After the move to Texas, Samantha worked part time for a short period, while Zachary had full-time employment. His job, which increased from 40 hours per week to between 75 and 80 hours per week, also required occasional out-of-state travel. Samantha continued to be the primary caregiver for the children while the parties were in Texas. The parties returned to Nebraska in September 2017 after a hurricane destroyed their home and belongings.

Upon returning to Nebraska, the parties lived with Zachary's mother in Kearney until March 2018 and then lived in their own residence until their separation. With respect to parenting roles, Samantha testified that Zachary had "a little more time with [her] and the kids" during this period.

Samantha ended the parties' relationship on February 28, 2020. Since March of that year, Samantha has lived in an apartment in Kearney. Her boyfriend, Matthew Zavela, resided with her there at the time of trial. Samantha has worked at a medical office for more than 2 years. Her schedule is Monday through Friday from 8 a.m. to 5 p.m. Her paystubs reflect a pay rate of $14 per hour (with occasional overtime at $21 per hour). Her 2020 income tax returns and W-2 show wages of $25,352. Samantha has health insurance coverage for herself.

When the parties separated and at the time of the temporary order, Zachary was employed at Eaton Corporation in Kearney, working from 10 p.m. to 7 a.m. Monday through Saturday and every other Sunday. His rate of pay was $25 per hour. In May, 2021, Zachary began employment at Parker Hannifin in Kearney. He initially had an overnight schedule, but at the time of trial, he was working Friday, Saturday, and Sunday from 6:30 a.m. to 6:30 p.m. and earning $27 per hour. The district court received, for demonstrative purposes, Zachary's proposed joint custody child support calculation (based on monthly income of $4,680 for him and $2,426.67 for Samantha). Zachary's W-2 earnings from Eaton were $56,106 for 2019 and $63,393 for 2020. The court also received a compensation summary, pay stubs, and benefit information from Zachary's current employment at Parker Hannifin. According to this information, Zachary's annual salary is $56,106 ($4,680 per month). His paystubs also show that he is working some overtime hours, for which he is paid $40.50 per hour. The parties agreed upon the income figures used in their respective proposed child support calculations.

Zachary's current residence in Kearney is a three-bedroom, two-bathroom apartment with a garage. Each child has their own bedroom in the apartment, and Zachary gave Lua the master

bedroom, which has its own bathroom, to help ensure her privacy. Zachary testified that the apartment is safe and located in a safe neighborhood.

Zachary testified at length about the children, their personalities and interests, and his relationship and activities with them. From this testimony, it is clear that Zachary is a good parent, has a good relationship with the children, and is actively involved in their lives. Zachary testified that one of the reasons he was seeking a parenting time schedule with more overnights was so that he could have more time to engage in an active relationship with the children. According to Zachary, he ensures that the children's needs with respect to food, clothing, and hygiene are always met when they are in his care.

Zachary testified about his involvement in the children's education, including his communication with the children's teachers and his attendance at parent-teacher conferences when they do not conflict with his work schedule. He noted that when Lua was struggling in math, he found a tutor for her over Samantha's objections. He did acknowledge not working with the children on their homework every day after school because of the limited time he has with them. He also testified about his involvement in meeting their medical needs. Until recently, Zachary had been the one to pick the children up when they are sent home sick from school. While Samantha usually sets up medical and dental appointments, he is usually the one who takes the children to the appointments.

Zachary presented testimony from several other witnesses about his parenting. Parker's current teacher (a former teacher of Lua's) confirmed that Zachary communicates with her, informs her of "updates" with respect to him and the children, and is generally involved in Parker's education. According to the teacher, she has not had any academic issues with Parker, and there has been only one behavioral incident with Parker that the teacher communicated to the parties. The teacher also testified about her communications with Samantha and about the efforts made by the parties and the school to assist Lua when she was struggling in math. Zachary also presented testimony from his father, mother, and sister, who all testified that he is a good father and actively involved in the children's lives.

Zachary believed he could coparent with Samantha on a joint custodial basis because he had done so for the previous year and a half. Specifically, he testified that he was able to communicate appropriately, and was willing to share time. Zachary testified to accommodations he had made based on Samantha's request, such as changing their method of communication from text messaging to emails and changing the parenting time drop-off location. However, he expressed concern that "communication from [Samantha's] end is almost nonexistent" and that Samantha sometimes communicates through the party's daughter. Zachary testified about ways in which he tries to foster the children's relationship with Samantha, including helping the children pick Mother's Day cards, purchasing Samantha and Matthew concert tickets, and giving Samantha extra time with the children. He also stated that he does not say anything disparaging or negative about her in front of the children. Similarly, he denied making disparaging comments about Matthew in front of the children. He did testify that he had no interest in meeting Matthew.

Zachary asked the district court to award him joint custody of the children, and the court received his proposed parenting plan. Zachary's proposal with respect to parenting time was that the parties would each have two overnights a week (Monday and Tuesday for Zachary and Wednesday and Thursday for Samantha) and alternating weekends from Friday evening to

Monday morning. His proposal also included alternating holidays, up to 3 weeks of summer vacation time, and a right of first refusal to keep the children any time the children would be in childcare for periods in excess of 4 hours. Zachary believed his proposed parenting plan was in the children's best interests as it would be beneficial for their physical, emotional, and mental needs. He also testified that the children would benefit from having equal time with both parents and that his plan would not disrupt the children's current schedules. Zachary was willing to ensure a consistent routine for the children in both homes. He expressed concern that an award of sole custody to Samantha would not be in the children's best interests. He again referenced a lack of communication from Samantha and testified that he felt the children were not her priority, based on her spending the evening out on Parker's birthday that year.

Samantha also testified about the children and their personalities. She noted that Zachary had signed both children up for scouting groups but that she was the one who took them to most of these activities. Samantha also testified about her involvement with the children's education and contact with their teachers. She indicated that Parker is doing well in school, although he had a recent incident of bullying which Samantha addressed with him upon learning of it. Samantha acknowledged resisting getting a tutor for Lua in math, testifying that she did not think a tutor was necessary as Lua had other educational assistance in place at school. Samantha felt that Lua's improvement in math was due to the other assistance she was receiving, rather than the tutor. The parties both testified about Lua's struggles with anxiety in social settings, which increased after the parties' separation, and their efforts to help Lua with her anxiety. Both children were receiving counseling at the time of trial.

Samantha testified about the parties' parenting time since their separation. When the parties separated, they arranged a schedule with alternating weekends and holidays. They followed this schedule until the temporary order. Samantha also testified about the effects of the COVID-19 pandemic on the parties' employment and parenting arrangements. Due to her employment in a medical office, Samantha has continued to work throughout the pandemic, but in March 2020, Zachary was laid off for a period, and the children's school went remote. At that point, the parties agreed that Zachary could come to Samantha's residence, use her internet and computer for the children's school "Zoom meetings," and have lunch with the children. According to Samantha, problems with this arrangement included coming home to a dirty house, homework not getting done, and the children not being fed properly. After that, Samantha would drop the children off and pick them up from Zachary's residence daily.

Samantha asked the district court to keep parenting time as it was at the time of trial, and the court received her proposed parenting plan. She felt that Zachary's proposed schedule would be more stressful for the children, noting that "they already have a hard time with the little bit of time that they have coming home, trying to get their homework and their food and their bath time done." She indicated that communicating appropriately and coparenting under the current arrangement was "already stressful" and that it would "be worse" under a joint physical custody arrangement. She did agree that Zachary's proposed plan involved fewer parenting time transitions. She testified that if joint custody were awarded, a better parenting time schedule would be "one week on, one week off to give them some sort of stability." Samantha testified about her request to change the parties' communications from text messaging to email, stating that Zachary was "being harassing over text messaging." She indicated that the multiple text messages sent by

Zachary on a daily basis caused her "stress everywhere in [her] life" and that while communicating by email was an improvement, Zachary "still does not speak in the most civil or cordial manner." Samantha denied using Lua to communicate with Zachary, stating that if she ever did so, it was when Samantha had already spoken with Zachary or Lua was "doing that on her own accord."

Matthew and Samantha began dating in June 2020, have lived together since about April 2021, and planned to get married on April 30, 2022. Matthew's name was added to the lease before he moved into Samantha's apartment. Samantha testified that the children get along really well with Matthew. She described his role with the children as "[her] partner, [her] teammate with them." Matthew confirmed that he gets along great with the children and that he assists Samantha with parental duties and daily routines. He describes Samantha as an engaged and dynamic parent with a "very straightforward personality" and as a caring and empathetic mother. He testified that Samantha has provided structure and stability for the children, which includes a schedule, rules, and chores. Samantha's testimony about her parenting and the rules and structure in her residence for her children was consistent with Matthew's.

Matthew confirmed that he has not formally met Zachary, but rather, only had contact during parenting time exchanges which are sometimes tense and on one occasion in 2021 involved Matthew calling the police. Samantha testified further about this particular incident, which she said was prompted by her confusion about the details of Zachary's next block of summer parenting time at that point. She indicated that Zachary became upset by the parties' interaction when he returned the children to her care and then stayed outside of Samantha's apartment for 30 to 45 minutes, not leaving until after police arrived. Zachary indicated that he also called the police on this occasion, and that he had been waiting for them to arrive "so that [he] could have the police document the situation that [Samantha] would not give [him] the children, even though [he] had a court order saying this." He testified that the police explained that they could not resolve a civil dispute. He denied verbally abusing or harassing Samantha during their encounter. He left after his contact with the police.

Zachary, his mother, and his sister all raised a concern in their testimony about Matthew's driving habits (driving fast and peeling out) after picking up the children or on other occasions. In particular, Zachary's sister observed this behavior following a parenting time exchange that occurred at the apartment complex where both Zachary's sister and Samantha reside. Matthew denied that he had driven inappropriately on this occasion. Samantha's testimony about the incident was consistent with Matthew's.

Matthew acknowledged having a pending DUI charge at the time of trial, but he denied ever drinking and driving or having driven inappropriately with the children in his vehicle.

Samantha and Matthew both expressed concern about the cleanliness of the children and their clothing upon returning from Zachary's care. They also indicated that the children have trouble readjusting to their routines after returning from parenting time with Zachary. Samantha testified that she has tried to work outside the parenting plan with Zachary, but that has also been a struggle. And, Samantha expressed frustration that, despite her requests, Zachary does not usually assist the children with their homework after picking them up from school and before taking them to Samantha's residence.

On January 25, 2022, the district court entered an order, denying Zachary's request for joint physical custody and adopting Samantha's proposed parenting plan (giving the parties joint

legal custody and Samantha primary physical custody) with certain modifications as to parenting time. The court expressed "some concerns," reasoning as follows:

> Despite [Zachary] having obtained different hours that would accommodate more parenting time[,] the parties have been unable to facilitate expanded parenting time. There was testimony regarding an unnecessary call to police. While there is no credible evidence of violence between the parties, they have agreed to meet a neutral location despite both living in the same town. [Zachary] expresses no interest in meeting [Samantha's] significant other, despite the fact that that significant other is spending significant time with the parties' children.

The court also observed that Zachary's proposed parenting plan would require frequent transitions and stated that it could not find such a plan to be in the children's best interests. With respect to parenting time, the district court ordered that Zachary was to pick the children up from school at 3:30 p.m. on Wednesdays (or from Samantha's home if there was no school) and return them to school on Thursday mornings (or to Samantha's home by 9 a.m. Thursday if there was no school). The court also awarded Zachary parenting time on alternating weekends from 6:30 p.m. Friday until 6:30 p.m. Sunday, alternating holidays, and for 3 weeks of vacation during the summer. Finally, the court increased Zachary's child support for two children to $720 beginning February 1, 2022, ordered him to pay for 62 percent of Samantha's work-related childcare expenses and of the children's nonreimbursed health care expenses in excess of $250.

The parties both filed motions for new trial. In her motion, Samantha asked the district court to address the issue of the tax exemptions and/or credits that had not been addressed in the modification order. She also asserted that the court should have awarded child support retroactively. In his motion, Zachary alleged that the court should have awarded the parties joint physical custody, adopted either his proposed parenting plan or a week-on-week-off parenting time schedule, and adopted his child support calculation. Zachary also alleged that the changes made by the court to his parenting time were not clearly stated and observed that the modification order had not allocated the tax credits.

At the hearing on the parties' motions, the district court granted Samantha's request that the parties split the tax exemptions for the children and took the remaining issues under advisement. On March 10, 2022, the court entered an order memorializing its ruling with respect to the tax exemptions and denying the parties' remaining requests.

## ASSIGNMENTS OF ERROR

Zachary asserts that the district court abused its discretion in (1) not awarding the parties joint physical custody, (2) not awarding him reasonable parenting time, and (3) not adopting a joint custody child support.

On cross-appeal, Samantha asserts that the district court abused its discretion in not applying the child support modification retroactively.

## STANDARD OF REVIEW

In a filiation proceeding, questions concerning child custody determinations are reviewed on appeal de novo on the record to determine whether there has been an abuse of discretion by the

trial court, whose judgment will be upheld in the absence of an abuse of discretion. *Franklin M. v. Lauren C.*, 310 Neb. 927, 969 Neb. 882 (2022). A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Simons v. Simons*, 312 Neb. 136, 978 N.W.2d 121 (2022).

Parenting time determinations are also matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *State on behalf of Carter W. v. Anthony W.*, 24 Neb. App. 47, 879 N.W.2d 402 (2016).

Modification of a judgment or decree relating to child custody, visitation, or support is a matter entrusted to the discretion of the trial court, whose order is reviewed de novo on the record, and will be affirmed absent an abuse of discretion. *State on behalf of Daphnie F. v. Christina C.*, 310 Neb. 638, 967 N.W.2d 690 (2021).

In a review de novo on the record, an appellate court is required to make independent factual determinations based upon the record, and the court reaches its own independent conclusions with respect to the matters at issue. *Kauk v. Kauk*, 310 Neb. 329, 966 N.W.2d 45 (2021). When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Id.*

ANALYSIS

*Joint Physical Custody.*

Zachary asserts that the district court abused its discretion in not awarding the parties joint physical custody. He argues that the evidence showed he was a fit parent and that an award of joint physical custody was in the children's best interests.

Neb. Rev. Stat. § 43-2923(6) (Reissue 2016) provides:

In determining custody and parenting arrangements, the court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of the foregoing factors and:

(a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;

(b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;

(c) The general health, welfare, and social behavior of the minor child;

(d) Credible evidence of abuse inflicted on any family or household member . . . ; and

(e) Credible evidence of child abuse or neglect or domestic intimate partner abuse. For purposes of this subdivision, the definitions in section 43-2922 shall be used.

In addition to the "best interests" factors listed in § 43-2923, a court making a child custody determination may consider matters such as the moral fitness of the child's parents, including the parents' sexual conduct; respective environments offered by each parent; the emotional

relationship between child and parents; the age, sex, and health of the child and parents; the effect on the child as the result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and the parental capacity to provide physical care and satisfy the educational needs of the child. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015).

"Joint physical custody means mutual authority and responsibility of the parents regarding the child's place of residence and the exertion of continuous blocks of parenting time by both parents over the child for significant periods of time." Neb. Rev. Stat. § 43-2922(12) (Cum. Supp. 2022). However, Nebraska statutes do not require the district court to grant equal parenting time or joint custody to the parents if such is not in their children's best interests. See *Kamal v. Imroz*, 277 Neb. 116, 759 N.W.2d 914 (2009). Neb. Rev. Stat. § 42-364(3) (Cum. Supp. 2022) provides:

> Custody of a minor child may be placed with both parents on a . . . joint physical custody basis . . . (a) when both parents agree to such an arrangement in the parenting plan and the court determines that such an arrangement is in the best interests of the child or (b) if the court specifically finds, after a hearing in open court, that joint physical custody . . . is in the best interests of the minor child regardless of any parental agreement or consent.

Joint physical custody is neither favored nor disfavored under Nebraska law. *State on behalf of Kaaden S. v. Jeffery T.*, 303 Neb. 933, 932 N.W.2d 692 (2019). In fact, no custody or parenting time arrangement is either favored or disfavored as a matter of law. *Id.*

The record shows that Samantha has been the primary caretaker for the children during much of their lives and the children are well cared for. On the other hand, it is clear that Zachary is a good parent and is actively involved in the children's lives. Since their separation, the parties have had some difficulties with effective communication and parenting exchanges, which has negatively impacted the children at times.

In its modification order, in addressing the parties' respective physical custody request and proposed parenting time plans, the district court expressed certain concerns. The court noted that despite a change in Zachary's work schedule, the parties had been unable to facilitate expanded parenting time. The court also noted "an unnecessary call to the police," the parties' agreement to meet in a neutral location, and Zachary's lack of interest in meeting Samantha's significant other. The court expressed concern that Zachary's proposed parenting plan would require frequent transitions. The court concluded that Samantha's parenting plan which proposed that she have sole physical custody was in the children's best interests. Upon our de novo review, we find no abuse of discretion in the district court's award of sole physical custody of the parties' children to Samantha.

*Parenting Time.*

Zachary asserts that the district court abused its discretion in not awarding him reasonable parenting time. The court adopted a modified version of the parenting plan proposed by Samantha. Under the parenting plan adopted by the court, Zachary was awarded regular parenting time overnight each Wednesday, picking them up from school Wednesday at 3:30 p.m. (or from Samantha's if no school) and returning them to school Thursday morning (or to Samantha's by 9 a.m. if no school), and every other weekend from 6:30 p.m. Friday through 6:30 p.m. Sunday. He was also awarded alternating holidays and 3 weeks of summer parenting time. Zachary's proposed

parenting plan included two overnights each week (Monday and Tuesday for Zachary, Wednesday and Thursday for Samantha) and extended the weekend parenting time through Monday morning. Zachary argues that the parenting time schedule awarded to him was unreasonable, given that he is a fit parent and that he had more parenting time under the temporary schedule leading up to the trial.

The trial court has discretion to set a reasonable parenting time schedule. *Thompson v. Thompson*, 24 Neb. App. 349, 887 N.W.2d 52 (2016). The determination of reasonableness of a parenting plan is to be made on a case-by-case basis. *Wolter v. Fortuna*, 27 Neb. App. 166, 928 N.W.2d 416 (2019). Parenting time relates to continuing and fostering the normal parental relationship of the noncustodial parent. *Anderson v. Anderson*, 27 Neb. App. 547, 934 N.W.2d 497 (2019). The best interests of the children are the primary and paramount considerations in determining and modifying parenting time. *Winkler v. Winkler*, 31 Neb. App. 162, 978 N.W.2d 346 (2022).

The Parenting Act does not require any particular parenting time schedule to accompany an award of either sole or joint physical custody, and there exists a broad continuum of possible parenting time schedules that can be in a child's best interests. *State on behalf of Kaaden S. v. Jeffery T.*, 303 Neb. 933, 932 N.W.2d 692 (2019).

Zachary's proposed parenting time plan set up a joint physical custody arrangement. We have already addressed his arguments with respect to the district court's award of physical custody. The court expressed concern, among other things, about the number of parenting time transitions required by Zachary's proposed plan. We note that Samantha's proposed plan (varying hours of parenting time for Zachary on Monday, Tuesday, Wednesday, and Thursday evenings during the school year, and a schedule of day time parenting on those days during the summer) also involved multiple transitions. While both proposed parenting plans contained multiple parenting time transitions in each 2-week period, the plan adopted by the court (a modified version of Samantha's proposed plan) contained fewer transitions than the temporary parenting time schedule or either of the plans proposed at trial. Upon our de novo review, we find no abuse of discretion in the court's adoption of the modified version of Samantha's plan.

*Amount of Child Support Award.*

Zachary asserts that the district court abused its discretion in not adopting a joint custody child support. Zachary's arguments in support of this assignment of error are premised on his assertion that the court should have awarded the parties joint physical custody. Given our resolution of his first assignment of error, we need not address this assignment of error further. An appellate court is not obligated to engage in an analysis that is not needed to adjudicate the controversy before it. *Kozal v. Snyder*, 312 Neb. 208, 978 N.W.2d 174 (2022).

*Retroactive Application of Child Support Modification.*

On cross-appeal, Samantha asserts that the district court abused its discretion in not applying the child support modification retroactively, and she argues that the modification should have been made retroactive to May 1, 2021.

Absent equities to the contrary, modification of a child support order should be applied retroactively to the first day of the month following the filing date of the application for

modification. *Johnson v. Johnson*, 290 Neb. 838, 862 N.W.2d 740 (2015). In the absence of a showing of bad faith, it is an abuse of discretion for a court to award retroactive support when the evidence shows the obligated parent does not have the ability to pay the retroactive support and still meet current obligations. *Freeman v. Groskopf*, 286 Neb. 713, 838 N.W.2d 300 (2013). In modification of child support proceedings, the children and the custodial parent should not be penalized by delay in the legal process, nor should the noncustodial parent gratuitously benefit from such delay. *Johnson v. Johnson, supra.*

Samantha filed her initial third party answer and counterclaim asking the court to modify child support and establish custody and parenting time on April 5, 2021. Absent equities to the contrary, the modification in this case should be applied retroactively to May 1, 2021, the first the first day of the month following the filing date of Samantha's counterclaim. In its January 2022 modification order, the district court ordered Zachary to pay child support of $720 per month beginning February 1. The court did not provide a reason for not making the modification retroactive. In her motion for new trial or to alter or amend, Samantha asked the court to make the modification of the child support award retroactive, but this portion of her motion was overruled without further explanation.

Zachary argues that awarding retroactive support would have been inequitable because at the time of trial he was working a different job than he was when the modification case started. He also argues that there was no evidence at trial that he could pay the arrearage amount of $918 (increase of $102 × 9 months) if the modification had been made retroactive.

In response, Samantha observes that at the time she requested a modification in April 2021, Zachary's child support obligation had been set based on a monthly income of $2,426.67. She observes further that at all times from when the parties separated in February 2020 through the date of the trial in December 2021, Zachary earned significantly more than $2,426.67 per month. She argues that the evidence did not show that a retroactive child support award would create an undue financial hardship for Zachary and that the district court could have fashioned a payment plan to cover the amount of such an award. See *Henke v. Guerrero*, 13 Neb. App. 337, 692 N.W.2d 762 (2005) (because child support modification is equity matter, court can also order payment plan for retroactive support). Finally, she observed that Zachary did not have a court-ordered obligation to reimburse her for childcare or nonreimbursed health care expenses until the end of July 2021. She argues that Zachary's refusal to voluntarily reimburse her for those things prior to the court's order increased her financial hardship during the course of this modification action.

The district court did not explain its decision not to award retroactive child support, and in our de novo review of the record, we cannot find any equities that would support a decision not to apply the child support obligation retroactively. See, *Roberts v. Roberts*, 25 Neb. App. 192, 903 N.W.2d 267 (2017)(finding abuse of discretion in failing to order retroactive award where trial court did not state reason for denying retroactive award and record did not show it would create financial hardship for father); *Gartner v. Hume*, 12 Neb. App. 741, 686 N.W2d 58 (2004) (finding abuse of discretion in failing to order retroactive award where father had been steadily employed, trial court did not explain decision, and de novo review of record did not show equities to support decision not to apply child support obligation retroactively). Zachary was clearly earning greater income than when the child support was last established ($4,680 versus $2,426), and we do not see that working a different schedule for a different employer is relevant to the determination of

retroactivity. The amount of retroactive support due, $918, is not a significant amount and there is nothing in the record to show that Zachary does not have the ability to pay the retroactive support. We find that the court abused its discretion in failing to make the increase in child support retroactive and we determine that the increase in Zachary's child support obligation should be retroactive to May 1, 2021. We modify the order accordingly.

CONCLUSION

The district court did not abuse it discretion in its awards of custody, parenting time, and child support. However, we conclude that the court abused its discretion in failing to order Zachary's modified child support obligation be retroactive to May 1, 2021. We modify this portion of the order.

AFFIRMED AS MODIFIED.